**UNITED STATES of America**
**v.**
**Larry E. EVANS, Appellant.**
**No. 23046.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1970.

Decided Jan. 7, 1971.

Petition for Rehearing Denied Feb. 25, 1971.

---

Bazelon, Chief Judge, dissented and filed opinion.

Mr. James F. Gordy, Washington, D. C., with whom Mr. Paul H. Delaney, Jr., Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. Richard M. Minkoff, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U.S. Atty., and John A. Terry, Asst. U.S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, McGOWAN, Circuit Judge, and MATTHEWS *, Senior District Judge, United States District Court for the District of Columbia.

McGOWAN, Circuit Judge:

Appellant was convicted by a jury of burglary, assault with a dangerous weapon, and petit larceny. His only challenge to this conviction on appeal is that his identification at trial by the victim was fatally tainted by a pretrial confrontation which transgressed the Fifth and Sixth Amendments. That issue was explored by the District Court in an evidentiary hearing before the jury was summoned. and the court ultimately decided against appellant's constitutional claims. By reference to the precise circumstances shown by this record, we sustain that ruling.

I

The complaining witness was a housewife in Northeast Washington who testified that she first saw appellant the day before the alleged offenses occurred. On that occasion she was walking her dog in the vicinity of her home and, in her testimony, she described his appearance at that time. On the day following, she saw appellant again at about the same place as she was out walking

* Sitting by designation pursuant to Title 28, U.S.Code, Section 294(c).

with her little girl. After the witness returned to her home a few minutes later, appellant entered the house, threatened her with a knife, and physically dragged her about the house with him as he searched for money. The victim testified that appellant was in the house for about one hour, and she gave the police shortly thereafter a detailed description of appellant founded upon unusual opportunities to observe appellant at close range and to fix his features in her mind.

About two weeks later, so the victim testified, she saw appellant for the third time. She was walking along the street near her home with a male acquaintance in the late afternoon of October 24, 1968, when she saw appellant coming out of an alley some 20 feet away. She immediately told her companion that appellant was her attacker. Appellant appeared to recognize the victim and departed hastily. The companion went into a nearby building to call the police. When he had the police on the wire, he put the victim on to give a description, and left to pursue appellant.

A police radio lookout was immediately broadcast and was heard by Officer Mitchell, who was in a police car in the area, accompanied by his dog.[1] Officer Mitchell very soon saw a person walking along the street towards him who appeared to be the one referred to in the radio lookout. He stopped his car and waited for the suspect to reach him, but the suspect, when he saw Mitchell, ran through an alley. Mitchell drove around to intercept him on the other side, and took him into custody by threatening to loose the dog if the suspect did not stop. By that time another police car had arrived on the scene, and Mitchell asked it, because it had more room, to take appellant back to the place where the call to the police originated. He followed immediately behind in his car.

Mitchell's testimony as to what he found when he got there is as follows:

A   There was three of them standing there and I walked over and asked them who had called.

Q   You asked what?

A   I asked who had called.

\*  \*  \*  \*  \*  \*

Q   What did you tell them on the way to the cruiser, Officer? What did you say to the three people?

A   What did I say to them?

Q   What did you say to them?

A   I asked them if this was the subject that they were chasing.

The victim's testimony as to this meeting was in these terms:

Q   Was it Officer Mitchell you spoke with?

A   Yes.

Q   Do you recall what, if anything, he told you?

A   He said, "What is this all about? I have a man in the car. Are you the lady who called?" And I said, "Yes." And he said, "Was this a burglary or what?" And I didn't say anything, I just looked at him.

---

1. Officer Mitchell's car was designated as Cruiser 654. The radio lookout was as follows:

"Disp:     Scout 91, complainant at 318 A–Adam N.E. says the subject that broke into her house last week is now on 3rd Street toward East Capitol. Described as a Negro male. He's got a blue jacket, grey pants and white tennis shoes. She's at 318 A–Adam.  5:34
"Sct. 91:  91–10–99.
"Disp:     Any other unit in 9 can assist 91?

"Cr. 654:  Cruiser 654, what was that address again?
"Dist:     She's at 318 A–Adam N.E. The subject is on 3rd. going towards East Capitol from A. Did you copy the lookout?
"Cr. 654:  10–4, I got that.
           \*   \*   \*   \*   \*
"Cr. 654:  (unreadable). 654, I have that subject at Terrace Court ·and A St. Would you have a car meet me around here?"

And then he said to come over and *see if this is the man I reported.* (Emphasis supplied.)

Mitchell described his understanding to be that, while the victim was on the phone with the police, her companion was chasing appellant.[2] He therefore asked both the victim and this companion, who was standing with her when the police arrived with appellant, to walk over to the police car with him. This is his account of what happened:

A Well, she went up and I opened the door for her to see the defendant who was sitting in the car, and immediately almost—she was standing outside—she became very nervous, excited and upset, and she definitely said, "Yes, that's the man."

Q Now, did you tell her anything about the circumstances under which he was arrested or anything about the defendant, himself?

A No, sir, because I really didn't know what it was all about. I knew he was wanted for assault but I didn't know what it was.

Q Did you hear anyone else tell her anything about the circumstances under which he was arrested or anything about the defendant himself?

A No, sir.

Q To your knowledge, were you the first officer to communicate with

her after the defendant was arrested?

A Yes, sir, I was.

Q Were you the only officer to communicate with her from the time he was arrested until the time she came over to the vehicle to identify him?

A Yes, sir, I'm sure that I was.

II

The contentions made to the District Court with respect to the propriety of the in-court identification focused upon our decision in Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969).[3] In that case we held that the prompt return by the police of an arrestee to the scene of the crime for identification by the victim or other eyewitnesses did not fall afoul of either the Fifth Amendment's requirement of due process or the Sixth Amendment's guarantee of the assistance of counsel. Appellant pointed out that the confrontation in *Russell* took place a few minutes after the offense, whereas in this instance the exhibition of appellant to the complaining witness took place nearly two weeks after the commission of the alleged crimes. Thus, so it was said, the considerations which moved this court to rule as it did in *Russell* are wholly without force here, and the strictures of the *Wade-Gilbert-Stovall* trilogy are fully operative.[4]

2. The companion was an employee of a museum two doors from the victim's home, and was acquainted with the victim. It was to the museum that the victim came in a hysterical condition to report the assault upon her at the time of that offense. Thirteen days later this employee was standing on the sidewalk in front of the museum with the victim and another friend when the victim saw appellant and identified him as her assailant. The museum employee testified that, when appellant fled, he first went into the building to call the police and, after turning the phone over to the victim, went outside again to give chase to appellant.

3. *See also* Wise v. United States, 127 U.S. App.D.C. 279, 383 F.2d 206, cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968); Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (1968); Jackson v. United States, 134 U.S.App. D.C. 18, 412 F.2d 149, 153–154 (1969); and United States v. Miller, (No. 22,-332, decided March 23, 1970). For a state case in accord with Russell, *see* Commonwealth v. Bumpus, 354 Mass. 494, 238 N.E.2d 343 (1968), cert. denied, 393 U.S. 1034, 89 S.Ct. 651, 21 L.Ed.2d 579 (1969).

4. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gil-

The Government, contrarily, urged upon the District Court the relatively unique character of this accidental encounter on the street of the victim and her assailant, the spontaneous recognition that was forthcoming from the former, and the situation that was created by the flight of the suspect, the victim's telephone call to the police, and the ensuing radio lookout. It stressed the testimony by Officer Mitchell that his purpose was not to assure that he necessarily had the man who had committed a crime but, rather, to be certain that the man he had detained on the street in response to the radio lookout was in fact its subject. Viewed in this light, said the Government, the rationale of *Russell* is applicable, and Officer Mitchell is not to be faulted for not having taken the person seized by him directly to the police station.

The District Court, after remarking that it had "never seen a case with these facts," concluded that those facts warranted an "exception to the general rule," and ruled that the fact of the pretrial identification could be introduced into evidence by the government, as well as an in-court identification made by both the victim and her companion. In consequence, all these things were done at the trial.[5]

We have recently had occasion to recognize that "[A]lthough it is unquestionably highly suggestive to present a single suspect to a witness for identification, nevertheless in some circumstances the procedure may be justified." United States v. Green, 141 U.S.App. D.C. 136, 436 F.2d 290 (decided November 12, 1970). This, of course, echoes the observation of Mr. Justice Douglas, dissenting in Biggers v. Tennessee, 390 U.S. 404, 408, 88 S.Ct. 979, 981, 19 L.Ed. 2d 1267 (1968), that "[O]f course, due process is not always violated when the police fail to assemble a lineup but conduct a one-man showup." In *Stovall* itself the Supreme Court found no due process violation in what was surely one of the most suggestive showups ever held. It concluded in that instance that the police action under the special circumstances there present was a reasonable response to the particular problem the police faced. And in the pioneer case dealing with due process in photographic identification, Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), the Court declined, "either in the exercise of our supervisory power, or, still less, as a matter of constitutional requirement," to ban all pretrial photographic identification, as it had been pressed to do. "Instead," said the Court, "we hold that each case must be considered on its own facts;" and from that premise the Court evolved a standard which it characterized as one that "accords with our resolution of a similar issue" in *Stovall.*

In our recent *Green* decision, which also involved an arrest made by reason of a rape victim's chance recognition of her attacker on the street ten days after the offense, we remarked that Fifth Amendment due process is not breached by the prompt presentation of a single suspect "to a witness whose recollection of the offense is still exceedingly fresh," nor is the Sixth Amendment's require-

bert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

5. Although this trial took place after our *en banc* decision in Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), the trial court did not avail itself of our suggestion that efficient judicial administration would be furthered by the court's always ruling on independent source, whatever its decision on the alleged violation might prove to be. This record seems especially strong on the likelihood of an independent source, since the victim testified both as to her observation of appellant twice before she was attacked, and during the attack itself, which lasted one hour. The prosecution, by not pressing for an independent source finding, and further by not limiting its evidence to an in-court identification, foreclosed itself from a most promising basis for an unexceptionable affirmance or, at worst, a remand for a supplementary finding on independent source.

ment of counsel violated where "the interest in speedy identification \* \* \* justifies the failure to arrange a formal lineup \* \* \*" These are the foundations upon which our *Russell* doctrine largely rests. The question of their appositeness to the action taken by the police under the circumstances of the case before us is, as we said of the similar situation in *Green*, "a difficult one." [6]

It is relevant to remind at this point that due process, after all, remains at bottom a matter of official action which patently "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[7] Similarly, as respects the counsel guarantee of the Sixth Amendment, the Supreme Court's treatment of that matter in the 1967 *Wade* trial reveals unmistakably a preoccupation with the dangers inherent in a police practice which had been the rule rather than the exception.

The record before us does not present the usual pattern of litigated pretrial identifications. That pattern is mainly woven of pretrial confrontations that occur (1) well after the crime itself, and in official surroundings when the police have had the suspect under arrest for some time, or (2) at the scene of the offense when the police have captured the suspect shortly after the crime, as in *Russell*. We start, however, with a chance encounter on the street 13 days after the offense. The victim spontaneously asserts the fact of recognition to her companion, and the suspect flees. The victim hurriedly reports what she has seen to the police, and the chase begins in a metropolitan city. The radio lookout places each policeman in the vicinity under a duty to detain and investigate anyone who resembles the broadcast description. Officer Mitchell hears the lookout, quickly spots a figure on the street who appears to fit the radioed description, and takes him into custody when he flees.

Officer Mitchell's testimony as to his purpose in taking appellant to the recognition scene rather than to the police station appears to be credible, and no one, either in the trial court or here, has suggested that it was not. He said that he knew nothing about the crime for which appellant was wanted. Accordingly, it was not, nor could it have been, his purpose to link appellant to it. His immediate job, as he conceived it, was simply to be sure that he had picked up the man who was the subject of the radio lookout. Since the person who initiated that lookout was a short distance away, it seemed reasonable to him to ask her then and there if appellant was the man about whom she had just telephoned the police.

---

6. Our formulation of the problem in *Green* was in these terms:

> It might be argued that similar considerations obtain in this case, that there is a strong interest in a prompt identification to determine whether the police officers have arrested the man who was seen on the street by the victim. On the other hand, it may be argued that the important question is whether the officers have arrested the offender, and not whether they have arrested the man recently seen on the street; therefore a suggestive confrontation cannot be held to confirm the street identification when it might taint the witness's recollection of the actual offense.

The state of the record in *Green* was not such as to require a resolution of the matter.

7. Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (overruled on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1963)). The Supreme Court's various formulations, ranging from conduct that "shocks the conscience," Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1951), to that which impinges upon rights "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), all appear to contemplate ascertainable gradations between that official action which does, and that which does not, exceed civilized limits. The hazards of using the metaphor of a fixed line of demarcation are, however, lyrically illuminated in Field, Frankfurter, J., Concurring \* \* \*, 71 Harv.L.Rev. 77 (1957).

It seems reasonable to us, too. And we find in this record no trace of a deliberate police purpose to circumvent the commands of the Fifth and Sixth Amendments as those have been defined by the Supreme Court in the pretrial identification context. Neither do we see in the totality of this record any unacceptable degree of probability that Officer Mitchell's action gave rise, in the Supreme Court's *Simmons* formulation, "to a very substantial likelihood of irreparable misidentification." The testimony simply does not lend itself to any ponderable apprehension that the victim in this case would, in looking at appellant pursuant to Officer Mitchell's request, confirm only the image she had formed of appellant in the street encounter a few moments before. Rather, the evidence speaks eloquently to the effect that that image was firmly etched in her mind by the hour she spent in close contact with appellant when he was a marauder in her home. What was confirmed was that Officer Mitchell had not blundered in his response to the radio lookout.

It is undoubtedly true, as appellant urges upon us, that Officer Mitchell was, on the facts shown, legally empowered to have taken appellant directly to the police station and to have booked him there for whatever specific crime the officer would then have found him to be connected. That would have enabled the next pretrial confrontation to take the shape of formal lineup, with all the values that patently characterize that manner of proceeding. But, in the special circumstances of this record, that would not have been, as is so often the case, the only encounter between the victim and the suspect in the interim between the offense and the trial. In this case the first such meeting was the spontaneous recognition in the unexpected meeting on the street. Had appellant made good his flight on that occasion and eventually been arrested in another context, the victim could certainly have included that recognition in her identification testimony, thereby adding to its weight. All that Officer Mitchell did, or sought to do, was to seek reasonable assurance that he had not, in response to the victim's report of that encounter, picked up the wrong man.[8]

In *Russell* we stressed the virtues of identification by the victim of a crime while the recollection is fresh, and, to a lesser degree, concern for not arresting the wrong man. The former consideration, in the special circumstances of this record, strikes us as not particularly relevant. When there is a chance encounter provoking spontaneous recognition of the credible character here involved, the problem is not essentially one of fresh recollection. The second consideration appears, by his testimony, to have been very much on Officer Mitchell's mind and, we think, properly and understandably so. An important public interest comprehended within this second foundation of *Russell,* distinct from the inconvenience and indignity suffered by the innocent arrestee, relates to the effective utilization of police resources. If Officer Mitchell had the wrong man, it was essential under the circumstances that he return to searching the vicinity for the right one as promptly as possible. It is tricky business to effectuate radio lookouts in a city area on a late afternoon, and, even though the correspondence of appellant's appearance to the lookout description may arguably have afforded Officer

---

**8.** One may wonder, indeed, why the prosecution thought it important to enlarge its direct case by testimony going beyond the victim's recognition of appellant on the street and his prompt arrest in consequence thereof. The weight of the Government's case would not appear to have been materially increased by an explicit showing that no mistake had been made in the arrest of the man who was the subject of the radio lookout. The defense would, of course, have been free to bring out this confrontation on cross-examination, but the perils of doing so are obvious.

Mitchell with little cause to worry,[9] we see nothing unreasonable about the extra precautions he decided to take against possible error. We are not persuaded that his discharge of his duty, as he saw it under the exact facts before us, took him palpably outside the confines of the Constitution.

It would, we think, be delusive to regard our affirmance of this conviction as a wholesale and sweeping extension of *Russell*, thereby opening up wholesale possibilities of showups remote from the offense in point of time.[10] Given what this record shows with respect to the chance street encounter of this victim and this appellant, and the circumstances in which Officer Mitchell entered into this picture, we do not consider that *Russell* really has much to do with the result we reach. Put another way, this record would, in our judgment, have supported affirmance even if *Russell* had gone the other way.

Affirmed.

9. Officer Mitchell's testimony was that there were not many people in the block where he first saw appellant, but "there were some." In response to a question as to whether he saw "anyone else in the general area that matched the description" contained in the radio lookout, he replied in the negative. He said that ten minutes at the outside elapsed between his first sight of appellant and the viewing of him in the police car by the victim.

10. We note in this regard, without comment or intimation of opinion, that the police are apparently currently operating under a self-imposed time limitation in the return of suspects to the scene of the crime for identification. Memorandum Order No. 16 (Series 1970) of the Metropolitan Police Department, dated May 15, 1970, provides, among other things, that

"If a suspect is arrested within 60 minutes of an alleged offense and within an area reasonably proximate to the scene of the crime, he shall be returned to the scene of the offense, or the eyewitnesses shall be transported to the scene of the arrest, for identification of the suspect."

BAZELON, Chief Judge (dissenting):

I am unable to agree with the court that admitting testimony of the scout car identification was not constitutional error.

I

The heart of the court's decision lies in its conclusion that Officer Mitchell's conduct in this case was reasonable:

He said that he knew nothing about the crime for which appellant was wanted. Accordingly, it was not, nor could it have been, his purpose to link appellant to it. His immediate job, as he conceived it, was simply to be sure that he had picked up the man who was the subject of the radio lookout.[1] No claim seems to be made here that Officer Mitchell made an honest mistake and thought that the situation was no different from *Russell*; the court does not argue that he believed he was returning appellant to the scene of the crime minutes after its commission.[2]

The only exceptions contemplated to this 60-minute rule are where either the suspect or the victim has been admitted to the hospital in a critical condition as a consequence of the crime.

1. P. 167 *supra*.

2. The record does not justify a conclusion that Officer Mitchell thought he was in a *Russell* situation, and if the court had wished to rely on such a possibility, it would have had to remand the case for further findings.

The Government had clearly had hopes of suggesting that such an honest mistake had been made by Officer Mitchell, as its line of questioning at the identification hearing shows:

Q Now, there was a radio run that said he was being chased by someone from the scene of an assault, is that correct, sir?

A [Officer Mitchell] It didn't say he was being chased from the scene of an assault; he was being chased by a subject and he was wanted for assault.

It is also worth remarking that the initial police dispatch, p. 164 n. 1 *supra*, stated (inaccurately) that the offense took place "last week," and Officer Mitchell, who

We are faced in this case, therefore, with a police officer who knew that he was not within the *Russell* rule, but who nevertheless returned the suspect to the complaining witness for a one-man show-up. Given this context, I think it is wrong to identify the reasonableness of the police officer's conduct as the essential issue in this case.

It was not absolutely clear to Officer Mitchell that he had in fact arrested the right man—that is, the man whom the complaining witness had spotted a few minutes before. Hence his desire to return to the scene of the identification for immediate confirmation. Whether appellant was the man complainant had just seen on the street would later become a jury question, a necessary step towards the conclusion that appellant was the man who assaulted complainant two weeks before. Viewed in this light, the situation does look very much like *Russell*: the suspect was not being returned to the scene of the crime immediately after its commission, but he was being returned to the scene of an on-the-street identification, immediately after it occurred. The question, then, is whether we carve out an exception to the *Wade* rule parallel to the *Russell* exception. To say that the police conduct here was reasonable does not answer this question; it either begs the question or states only part of it. Our deci-

sion here should turn on a recognition of the rules laid down by the Supreme Court in *Wade*, on an examination of the principles and policies that underlie those rules, and on a judgment whether those princples and policies lack sufficient application to the situation at hand so that there is no point in mechanically applying the rules here. The court proceeded in that fashion in *Russell*, and it should do so in this case. To me, application of that method leads to the conclusion that we must find constitutional error.

## II

In Russell v. United States[3] we held that *Wade*[4] does not require the exclusion of prompt on-the-scene identifications of a freshly apprehended suspect. This exception was later extended to cover similar identifications where the witness is taken to the scene of the arrest.[5] We recognized that permitting such procedures seemed to fly in the face of the Supreme Court's manifest concern with *any* pretrial confrontation.[6]

The Court had said:

> [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might serious-

---

clearly heard an address (which he asked to have repeated) and who heard and remembered the description of the suspect, never said or even suggested that he failed to hear that particular part of the dispatch.

3. 133 U.S.App.D.C. 77, 408 F.2d 1280. cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969).

4. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

5. United States v. Miller, No. 22,332 (D. C.Cir., March 23, 1970).

6. "[T]he principle of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158,

and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice."

United States v. Wade, 388 U.S. at 227, 87 S.Ct. at 1932 [emphasis in original].

ly, even crucially, derogate from a fair trial.[7]

These dangers, needless to say, are particularly acute when a single suspect is viewed in police custody. In *Russell,* we found a balance to these dangers in the greater accuracy of fresh identifications made within minutes of the witnessed crime.

> A man may see clearly in his "mind's eye" a face or a figure which he is hard put to describe adequately in words. Though the image of an "unforgettable face" may occasionally linger without any translation into words, photographic recall is most often ephemeral. Vivid in the flash of direct observation it fades rapidly with time. And the conscious attempt to separate the ensemble impression into particular verbalized features, in order to preserve some recollection, may well distort the original accurate image so that it is the verbalized characteristics which are remembered and not the face or the man.

> Balancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations in circumstances like those of this case will "if anything *promote fairness, by assuring reliability* * * *."[8]

Clearly this justification for an exception to *Wade* is absent in this case. Two weeks had passed since the crime. This is ample time for a witness's mental image of the criminal to fade or to shift imperceptibly as it is reflected upon. And while a spontaneous identification at a later date may be evidence that a vivid recollection has been preserved, there is not the guarantee obviously present in *Russell* that whatever vivid image is preserved in the mind during the "few moments" between sighting and arrest is in fact the image of the criminal.

Even though the specific justification for the *Russell* exception may not apply to this case, it may seem excessively technical to apply *Wade* to a scout car identification which follows a spontaneous identification on the street; for the spontaneous identification alone may "taint" the witness's later line-up or in-court identification. For example, the witness may identify the defendant on the street and, by getting a close look at him, observe particular features or characteristics that she had not noticed when the crime was committed. She may then rely upon these features when she picks the defendant out of a line-up or when she identifies the defendant in court. In such a case, an intervening scout car identification—however suggestive—would not be contributing to the later identification.

We cannot say, however, that spontaneous identifications will generally taint later identifications in the manner described and that the scout car identification will have no effect. In the first place, the witness may *not* have got a close look at the man she picked out on the street. If he was across the street, as he was in this case, or if his features were partially concealed by a hat, the witness may have decided that it is highly likely that he is her assailant, but still want to get a closer look before she is absolutely certain. It is precisely this "closer look" which may be prejudicial, given the suggestive nature of scout car identifications. Even where the witness thinks she has been positive in her identification on the street, a scout car confrontation may allay doubts of which she is not fully conscious. Where the witness has called the police to come and arrest the man she suspects, fear of embarrassment alone may subtly encourage her to identify the man they apprehend and then remember him in subsequent identifications.

In sum, scout car confrontations after spontaneous identifications on the street

---

7. *Id.* at 228, 87 S.Ct. at 1933, quoted in Russell v. United States, *supra*, 133 U.S. App.D.C. at 79, 408 F.2d at 1282.

8. 133 U.S.App.D.C. at 81, 408 F.2d at 1284 [emphasis added; footnote omitted].

do not generally assure reliability to such a degree that another exception to the *Wade* rule is justified.

It is tempting, at this point, to be swayed by the argument that prompt return to the scene in cases like this one will reduce unnecessary detentions of innocent suspects. As an initial matter, it must be emphasized that in *Russell,* though "expeditious release of innocent suspects" was mentioned as a factor in the decision,[9] it was considered as a factor only *after* it had been determined that the circumstances of the confrontations in question "if anything promote fairness, by *assuring reliability.*"[10] For the reasons I have already given, I cannot say that circumstances surrounding confrontations similar to the one in this case will assure reliability, nor do I find any such conclusion in the opinion of the court.[11] *Russell,* therefore, lends no support to the court's invocation of "protecting the innocent."

Even apart from the applicability of *Russell,* however, the argument from reducing unnecessary detention of innocent suspects is very weak. First, I believe that an innocent man, were he as aware of the dangers of misidentification as lawyers and judges are, would generally prefer to have the necessary time taken for a fairly conducted lineup. The logic of protecting the innocent forces one to the position that the sup-posedly innocent man should have some voice in the decision to return to the complaining witness. "Protecting the innocent" by giving them no choice at all has a very hollow ring to me.

Second, it seems to me that innocent men are adequately protected by the requirement that the police have probable cause before they arrest a suspect. In this case, for example, appellant was arrested within minutes of the time he had been sighted and described to the police as the perpetrator of a violent crime; he was spotted by an officer and arrested within two blocks of that initial sighting, wearing clothes which precisely fit the description given by complainant; he was first spotted in the direction in which complainant and her companion said he had fled, and his actions upon seeing the police car were suspicious. There is not the slightest doubt that there was probable cause to arrest this suspect, and therefore, probable cause for holding him a reasonable length of time to conduct a line-up.[12] In fact, the presentation of the innocent suspect argument in this particular case shows how easy it is to neglect and unnecessarily compromise the *Wade* principle. Not only was there ample probable cause to arrest this suspect, but there is no indication that other men seen in the area also fit the description given by the complainant.[13] Furthermore, the time

---

9. *Id.*

10. *See* p. 171, *supra.*

11. On page 168, the court does ask whether Officer Mitchell's action gave rise "to a very substantial likelihood of irreparable misidentification." To be sure, if this question were answered in the affirmative, his conduct is not likely to seem reasonable. Quite correctly, the court answers the question in the negative. The difficulty, however, is that this question is relevant to a challenge to the identification as a violation of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967), but it is not relevant to a challenge based upon *Wade,* where the proper question is whether the circumstances were so conducive to *reliability* of identification that there is no reason to apply the *Wade* rule.

12. It might be noted that lack of an adequate description to furnish the police with probable cause to arrest need not hamstring them entirely. In Stewart v. United States, 135 U.S.App.D.C. 274, 418 F.2d 1110 (1969), police officers took the complainant with them in the police car and cruised the neighborhood for an hour and a half before spotting three men who fit complainant's descriptions. If complainant had not been able to furnish a verbal description, it may still have been permissible to take him in the police car for a search of the neighborhood.

13. The absence of other men in the area fitting the description further supports a finding of probable cause for the arrest of appellant. But it is perfectly possible that a complainant's description might

was only 5:40 in the afternoon, hardly an hour at which the difficulty of preparing a prompt line-up, if the police had substantial doubts about the guilt of the man they have just arrested, seems extraordinary.[14]

I conclude that the scout car identification in this case did not occur in the kind of situation for which "substantial countervailing policy considerations" permit another general exception to the *Wade* requirement of counsel.[15] I would hold that it was constitutional error to allow the Government to introduce evidence of that identification into its case.

### III

Finding a *Wade* violation does not automatically require reversal of the conviction. It remains for me to state why I do not think that admission of the improper evidence in this case was harmless error. Given the strict standards laid down in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Harrington v. California,

be comparatively detailed, and that *two* men found in the immediate vicinity fit the description. In such a case there may well be probable cause to arrest both men and put them in a line-up, even though it is clear that one of them must be innocent.

14. *Cf.* Stewart v. United States, 135 U.S. App.D.C. 274, 418 F.2d 1110 (1969) (confrontation at 4:00 a. m.) ; Russell v. United States, *supra* (5:00 a. m.).

15. *See* Russell v. United States, *supra*, 133 U.S.App.D.C. at 80, 408 F.2d at 1284, quoting United States v. Wade, 388 U.S. at 237, 87 S.Ct. 1926.
Nor do I think it appropriate to affirm this case as a particular exception to the *Wade* rule. Spontaneous identifications by victims a substantial length of time after the crimes have been committed are not extraordinary. *See e. g.*, United States v. Green, 141 U.S.App.D.C. 136, 436 F.2d 290 (1970) discussed in the court's opinion, *supra*. More important, I fear that ad hoc determinations of exceptions to the per se rule in *Wade* would soon tend to undercut it substantially.

395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), it will be exceedingly rare to find harmless error when that error concerns the identification testimony of the sole witness and victim of a crime, and where no other evidence links appellant to that crime. In such circumstances, a claim of harmless error would not ordinarily deserve serious consideration; but the peculiar facts of this case do force me to examine closely the possibility of harmless error.

The critical question, as I understand *Chapman* and *Harrington,* is not whether it is clear beyond a reasonable doubt that the jury would have convicted appellant if it had not heard the illegally admitted evidence, even though members of this court—the author of this opinion included—have occasionally spoken as if it were.[16] Instead, I think it is clear that the test must be whether the appellate court is convinced beyond a reasonable doubt that the illegally admitted evidence did not *contribute to the verdict,* or alternatively, did not *sway some members of the jury.*[17] In short, what

16. *E. g.*, United States v. Miller, No. 22,- 332 (March 23, 1970) (Bazelon, C. J.) slip op. at 9: "We cannot imagine a different result if Goldberg's testimony had been barred"; Taylor v. United States, 134 U.S.App.D.C. 246, 248–249, 414 F.2d 1142, 1144–1145 (1969) ; "In applying *Chapman* we must look to all the evidence, defense and prosecution alike, and bring our judgment to bear upon the question of whether it is clear to us beyond a reasonable doubt that a guilty verdict would have resulted even if the jury had never heard the challenged testimony." I make no suggestion at all that these decisions were incorrect, or even that an improper test was in fact applied.

17. *See, e. g.*, Hamilton v. United States, 139 U.S.App.D.C. 368, 433 F.2d 526 (D.C. Cir., July 31, 1970) at 531: "[W]e find beyond a reasonable doubt that, because of the overwhelming weight of the evidence, the admission of Klein's out-of-court statements did not affect the jury's verdict * * *."

is critical is the impact of the illegal evidence on the jury, not the weight of the untainted evidence.

I draw these conclusions from essentially no more than a careful reading of *Chapman* and *Harrington.* These opinions are brief, so there is no point in quoting extensively from them here. It is clear that the Court in *Chapman* explicitly turned away from what may be called the "overwhelming evidence test" and associated itself with the test set out in Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963): "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." [18] Mr. Justice Brennan, dissenting in *Harrington,* accused the majority of overruling *Chapman* and adopting the overwhelming evidence test; but whatever ambiguity exists in the majority opinion does not permit this court to agree with him. The Court said at the end of its opinion: "We do not depart from *Chapman*; nor do we dilute it by inference. We reaffirm it."

The difference between the two tests is small, and the scopes of inquiry overlap. The weight of the untainted evidence in any case is certainly relevant to determining the possible impact on the jury of certain illegally admitted evidence. Nevertheless, there will be cases where the other evidence of guilt seems overwhelming, but where the illegal evidence was of a particularly persuasive kind. *Harrington* and *Chapman* require that these be reversed. We might recall the words of Justice Rutledge, discussing the federal harmless error rule in Kotteakos v. United States, 328 U.S. 750, 763–764, 66 S.Ct. 1239, 1247, 90 L. Ed. 1557 (1946):

[I]t is not the appellate court's function to determine guilt or innocence. * * * Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error. * * *

Turning now to the case at hand, I think, initially, that in the absence of testimony about the scout car identification, some jurors would have felt compelled to look much more closely at the events immediately following complainant's sighting the man in the alley across the street. A juror might not seriously doubt the correctness of that initial identification but still wonder whether the police arrested the right man. What might stand out in his mind is that appellant, when first seen by Officer Mitchell, seems to have been walking along the street in the opposite direction from that in which one would expect a man to be going if he were fleeing from the place where complainant first saw him, in the direction in which complainant claims to have seen him run. Not only that, but he was still only two or three blocks (depending upon how one postulates his path) from the place of sighting. Since both complainant and her companion agree that the man ran off, the time between her sighting and the initial police dispatch becomes important for a determination whether it is likely that a fleeing man would still be so close. An implicit contradiction that seems apparent between the testimony of complainant and her companion as to what street the fleeing man turned down only complicates the matter further. I recognize that according to Officer Mitchell appellant ran when he saw the police car and that appellant's own explanation of his actions at that time is implausible. Nevertheless, given the puzzling fea-

18.  375 U.S. at 86–87, 84 S.Ct. at 230.

tures of the chase, I feel that there is a very real possibility that what swayed some members of the jury on this issue was complainant's prompt identification right after appellant was arrested.

In addition, I cannot rule out the possibility that some members of the jury had qualms about the spontaneous identification made late in the afternoon from across the street. These jurors, too, might have had their doubts allayed by the scout car identification.

Since I cannot say beyond a reasonable doubt that the error in admitting testimony about the scout car identification did not contribute to the verdict, I would reverse these convictions and remand for a new trial.