STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DONALD X. WILKERSON, DEFENDANT-APPELLANT.

Argued January 11, 1972—Decided May 22, 1972.

454

*Mrs. Rosemary Karcher Reavey,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Ms. Reavey,* of counsel and on the brief).

*Mr. Elson P. Kendall,* Assistant Prosecutor, argued the cause for respondent (*Mr. Karl Asch,* Union County Prosecutor, attorney; *Mr. Kendall and Mr. Richard S. Schanen,* on the brief).

The opinion of the Court was delivered by
Mountain, J. Defendant was convicted of murder in the first degree. The jury having failed to recommend life imprisonment, *N. J. S. A.* 2A:113–4, the death sentence was

imposed and an appeal taken to this Court as of right. *R.* 2:2–1(a). A week after oral argument in this case, we handed down our opinion in *State v. Funicello,* 60 *N. J.* 60 (1972), wherein we concluded that the United States Supreme Court had declared the death penalty to be unconstitutional under our statute, last cited. The opinion directed that as to defendant, Funicello, the sentence of death, which had been imposed by the trial court, be set aside and that he be instead sentenced to life imprisonment, *nunc pro tunc,* as of the date sentence was initially imposed, but to remain entitled to the same credits as if the original sentence had been one of life imprisonment. The opinion went on to provide that a like order be entered with respect to all other defendants then under sentence of death. On February 29, 1972 such an order was entered with respect to this defendant, Wilkerson. Accordingly it is unnecessary to consider such of appellant's arguments as are directed to the alleged impropriety of his original sentence.

We turn, then, to other grounds upon which reversal is sought. The circumstances of the crime must be briefly recounted. As we state them here they rest upon such of the testimony in the record as presumably was accepted by the jury as being true. Defendant, who testified on his own behalf, denied practically everything upon which the State relied, insisting that he had been improperly arrested and brutally beaten by the police. No one else testified on his behalf and quite obviously his version of what occurred was not credited by the jury.

Acting in concert with four other men, defendant robbed the Bayway Circle Branch of the National State Bank in Elizabeth, New Jersey, on the morning of August 8, 1969. In the course of the robbery George Paszkowski, a corrections officer from Yardville Youth Reception Correction Center was killed by a shot fired by one of the robbers. Indictments for murder were thereafter returned against defendant and the other alleged participants. The State proceeded upon

the thesis of felony murder: a death caused in the commission of an armed robbery. *N. J. S. A.* 2A:113–1 and 2.

On the morning in question defendant and his colleagues drove to the bank in a stolen car, arriving shortly after nine o'clock. They wore masks and although some were armed, defendant apparently was not. Leaving the driver in the car, four of the band — including defendant — entered the bank. By coincidence a car from the Yardville Reception Center was passing the bank at this moment and one of the guards in the car saw what was taking place. The vehicle stopped and three guards alighted and started to move toward the bank. The driver of the getaway car, upon seeing them approach, fired and hit Paszkowski. He died from the wound later that morning. The other guards returned the fire. Hearing the shooting, the four robbers in the bank took alarm — but not before they had collected about $26,000 — and issued forth protecting themselves by propelling before them, as hostages, several innocent bystanders who unfortunately happened to be present. This maneuver interdicted the officers' fire and facilitated escape. In the course of its flight the getaway car collided with another moving vehicle and also hit a telephone pole, but eventually drew abreast of a second car — later found to have been registered in defendant's name — which had been stationed there earlier that morning. The thieves abandoned the stolen car and set out in defendant's vehicle, meanwhile firing indiscriminately at various passers-by who may have indicated a disposition to apprehend the bandits or impede their escape. Fortunately no one was hit. Except that immediately thereafter they were seen to pass through a red light and strike a parked car, no particulars are known as to their further flight, which ended on Irvington Avenue in Hillside where the automobile was found with a flat tire. Apparently at this point the second car was abandoned and the group set out on foot.

At about 9:30 the same morning, Arthur Franklin, a landscape gardener who was working in the neighborhood,

was accosted by one of a group of four or five men, who asked him if he had a car. Upon his replying in the negative, they passed on.

Very shortly thereafter, Clifford Owens, a truck driver, was asked by a man whom he later identified as the defendant to drive him from Elizabeth to Newark. Owens at first agreed, but shortly after they had started out he realized he did not have time to complete the trip and let defendant off somewhat short of his destination, at the same time supplying him with carfare.

About eleven o'clock of the same morning four members of the Elizabeth Police Department saw Wilkerson in Hillside not far from the site of the second abandoned car, driving a tan Pontiac and making what were described as "furtive movements." He was stopped and asked for evidence of ownership. He produced a certificate of registration in the name of Marvin Mittleton and identified himself as Mittleton. It so happened that the police had already found, in the abandoned getaway car, some document or paper upon which the name, Marvin Mittleton, appeared. Accordingly, when defendant gave this as his name he was at once placed under arrest for armed robbery and was informed of his constitutional rights. *Miranda v. Arizona*, 384 *U. S.* 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Shortly thereafter the arresting officers learned that Paszkowski had died and Wilkerson was told that was was now under arrest for murder. He replied, "I didn't kill that man." Parenthetically, as Wilkerson's later confession makes clear, he had made his way from the site of the second abandoned vehicle in Hillside to the place in Elizabeth where he met Owens, who had then driven him to the outskirts of Newark. Thence he had proceeded to the home of his cousin, Marvin Mittleton, whose tan Pontiac he had borrowed to return to Hillside to try and remove the incriminating car with the flat tire before it was discovered by the police.

Upon his apprehension the officers drove him the short distance to the place where Franklin was working and asked

the latter whether Wilkerson was one of the group he had seen earlier that morning. He was at once so identified.

Defendant was then taken to the Elizabeth police station and booked. He was again given the constitutional admonitions and although at first choosing to remain silent, he shortly gave two inculpatory statements, substantially identical in content, to Sergeant McGuire and to Detective Zehl. In these statements he recounted the crime in detail, including his own active participation. Later the same afternoon, while proceeding along a corridor in the station house, he was recognized by Clifford Owens who had been summoned to see if he could identify his passenger of the morning, and who happened, apparently by chance, to be also walking along the same corridor.

Defendant's principal contentions are that his inculpatory statements were improperly received in evidence and that the in-court identifications made by Franklin and Owens were tainted by out-of-court identifications that were impermissibly suggestive and made when defendant was without the benefit of counsel, all within the prohibitions of *United States v. Wade,* 388 *U. S.* 218, 87 S. Ct. 1926, 18 *L. Ed.* 2d 1149 (1967) and its companion cases.

We first consider the issue as to whether the confessions were properly received. Upon this point the trial court conducted a preliminary hearing that lasted two full days. The State produced about a dozen witnesses who set forth in minute detail the circumstances surrounding the giving of the incriminating statements. Defendant himself testified that he was beaten by the police and did not in fact make the statements attributed to him. However, he offered no further proof to corroborate his version of events. At the conclusion of the hearing the trial judge determined that the inculpatory statements given by the defendant were not the result of force or duress, nor were they in any other way coerced. He further concluded that the *Miranda* warnings had been given upon at least two and probably upon three occasions after which the statements had been freely made.

He characterized the defendant's contradictory narrative as a massive fabrication born of desperation. Our own examination of the record induces the belief that these conclusions were well nigh inescapable.

■ Defendant further contends that the damaging statements should have been denied admission under the reasoning of the Supreme Court in *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed.* 2d 441 (1963). In *Wong Sun* law enforcement officers broke illegally into defendant's home. Certain statements made by him which derived immediately from the unlawful entry were held to have been improperly admitted as "fruits" of the official illegality. Defendant argues here that his confessions were the product of the allegedly improper identifications made earlier the same day by Franklin and Owens. Quite clearly this is not so. Assuming, *arguendo,* that there was something improper about the identifications, there is no showing that there was any causal connection between them and the later confessions. One was not the "fruit" of the other.

■ The contention is also made that the trial court erred in not instructing the jury that before considering the incriminating statements and before determining whether they were voluntarily given, the jury must first decide, beyond a reasonable doubt, that the statements were in fact made. There is no basis for this contention because the requisite instruction was in fact given several times. For instance, the charge included the following:

> You must first determine whether the State has proven beyond a reasonable doubt, that is, to your satisfaction individually to a moral certainty that the defendant gave either one or both of these statements to Sergeant Giacalone or Detective Zehl. If you find that the State has not proven beyond a reasonable doubt that the defendant gave either or both of these statements, then you should completely disregard and not give any evidential weight whatsoever to any such alleged statements.

Certainly no more than this was required.

During its deliberations the jury sent the judge the following message: "We would like to see Wilkerson's statement given to Sergeant Giacalone. The statement was handwritten by the Sergeant." The statement had not been received in evidence. Sergeant Giacalone had, however, been permitted to read it to the jury on his direct examination. In response to the jury's request, therefore, that portion of the Sergeant's testimony that included the statement was again read to the jury. Defendant argues that the repetition of the statement tended unduly to exaggerate its importance in the minds of the jurors. Normally a trial court, which has ultimate discretion in the matter, should readily accede to any request by a jury to have any particular testimony read to it during its deliberations. And as Justice Francis has observed,

> There is no need to be chary for fear of giving undue prominence to the testimony of the witness. If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. [*State v. Wolf*, 44 *N. J.* 176, 185 (1965)]

As we have said, the matter rests in the sound discretion of the trial court, and here there was certainly no abuse of such discretion.

It should be mentioned that defendant's incriminating statements were full and explicit. If believed, as they apparently were, there could have been little doubt in the minds of the jury as to his guilt.

It will be recalled that defendant was twice identified on the day of the crime. Franklin recognized him as having been, very shortly after the robbery, in the vicinity of the spot where the second getaway car was abandoned; Owens identified him as the person he drove from Elizabeth to Newark a little later in the morning. Defendant contends that upon each occasion he should have been provided with counsel and that each identification was so impermissibly

suggestive and so unduly conducive to mistaken identification as to come within the prohibitions of *United States v. Wade, supra,* and its companion cases.

In the first place this court has never decided that the *Wade* rule is applicable to a pre-indictment identification. Neither has the United States Supreme Court, although we note that this issue is now pending before that Court. *People v. Kirby,* 121 *Ill. App.* 2d 323, 257 *N. E.* 2d 589 (1970); *cert.* granted *sub nom. Kirby v. Illinois.* 402 *U. S.* 995, 91 *S. Ct.* 2178, 29 *L. Ed.* 2d 160 (1971). But even if the *Wade* rule is eventually found to be not limited to post-indictment situations, it would in no event apply here.

█ The identification by Franklin occurred about 90 minutes after he had first observed defendant. The case comes well within the exception to the *Wade* rule which sanctions one-on-one identifications made at the scene of the initial observation — whether or not it be the scene of the crime — or within a reasonably short time thereafter. *State v. Edge,* 57 *N. J.* 580, 585–588 (1971); *State v. Thomas,* 107 *N. J. Super.* 128 (App. Div. 1969); *State v. Morales,* 116 *N. J. Super.* 538, 544–545 (App. Div. 1971); *Russell v. United States,* 133 U. S. App. D. C. 77, 408 *F.* 2d 1280 (1969), *cert.* den. 395 *U. S.* 928, 89 *S. Ct.* 1786, 23 *L. Ed.* 2d 245 (1969); *United States v. Perry,* 449 *F.* 2d 1026 (D. C. Cir. 1971); *United States v. Gaines,* 450 *F.* 2d 186 (3rd Cir. 1971). On or near-the-scene identifications have generally been supported upon three grounds. They are likely to be accurate, taking place, as they do, before memory has faded. They facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent. *United States v. Perry, supra,* 449 F. 2d at 1032–1034. Here armed robbery and murder had just been committed by a band of brigands whose conduct throughout the entire criminal episode would find parallel only in the most lawless days of our country's history. The police had good reason to believe that the group of men whom Franklin observed at

about 9:30 in the morning were in fact the criminals they sought. If one of their number could be identified, he might well lead them to the others before they could make good their escape from the general vicinity. To have taken defendant to the police station and waited until counsel had arrived and then to have proceeded with a line-up would have meant the surrender and relinquishment of this possibly effective aid to quick apprehension. There is nothing in the *Wade* doctrine requiring law enforcement authorities under circumstances such as these to forego the advantages accruing from early identification. If a suspect is innocent, the confrontation will effect his early release. *Stovall v. Denno,* 388 *U. S.* 293, 87 *S. Ct.* 1967, 18 *L. Ed.* 2d 1199 (1967).

The identification made by Owens in the late afternoon of the same day was also unobjectionable. The two men, Owens and Wilkerson, passed one another in a hall corridor. Owens immediately and quite spontaneously recognized defendant as the same person he had driven to Newark in the morning. A chance encounter provoking spontaneous recognition, whether occurring in the street, *United States v. Evans,* 438 *F.* 2d 162 (D. C. Cir. 1971), *cert.* den. 402 *U. S.* 1010, 91 *S. Ct.* 2196, 29 *L. Ed.* 2d 432 (1971), or in the station house, *State v. Bibbs,* 461 *S. W.* 2d 755 (Mo. 1971) does not come within the strictures of the *Wade* rule.

We note, finally, that the evidence of identification supplied by Franklin and Owens was in no way necessary to secure a conviction. It did no more than supply corroboration of collateral circumstances tending to link defendant with the crime. At the time of his arrest his trousers were bloodstained, his arm was cut and particles of glass — thought to have come from shattered car windows — were in his hair. The second getaway car was registered in his name. His detailed confession, either considered alone or together with these additional incriminating facts, was amply sufficient, without more, to support his conviction. If there was in fact error in admitting the identification evidence, it

was certainly harmless error and can form no basis for reversal. *Chapman v. California,* 386 *U. S.* 18, 87 *S. Ct.* 824, 17 *L. Ed.* 2d 705 (1967); *Harringlon v. California,* 395 *U. S.* 250, 89 *S. Ct.* 1726, 23 *L. Ed.* 2d 284 (1969).

We have carefully considered the additional points raised by appellant and find them to be substantially without merit. Except for the modification of the sentence as described above, the judgment of the trial court is affirmed.

FRANCIS, J. (concurring and dissenting). I agree that the evidence fully supported the jury finding that the defendant was guilty of murder in the first degree. However, because I adhere to the view expressed in the dissent in *State v. Funicello,* 60 *N. J.* 60, 84 (1972), I vote to affirm the judgment of the trial court.

FRANCIS, J., concurs and dissents.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reversal*—None.