929 A.2d 1041

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. RONALD BURNS, DEFENDANT–RESPONDENT.

Argued March 19, 2007—Decided July 26, 2007.

316

*Maura K. Tully,* Deputy Attorney General, argued the cause for appellant (*Stuart Rabner,* Attorney General of New Jersey, attorney).

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Christopher D. Adams* and *Leigh–Anne Mulrey* submitted a brief on behalf of *amicus curiae,* Association of Criminal Defense Lawyers of New Jersey (*Walder, Hayden & Brogan,* attorneys).

Justice WALLACE, JR., delivered the opinion of the Court.

In this appeal, we must determine whether defendant was deprived of a fair trial when the trial court permitted a witness to express before the jury that he refused to answer specific questions. The Appellate Division concluded that although the witness's refusal to testify was not based on a Fifth Amendment privilege, it was error to permit the witness to refuse to answer specific questions in front of the jury because that procedure improperly added critical weight to the State's case. We disagree and reverse. We conclude that, faced with the difficult dilemma of handling a recalcitrant witness who had no valid basis to refuse to testify, the trial court did not abuse its discretion by allowing the prosecutor to call a witness who declined to answer specific questions before the jury. We also conclude that the trial court properly instructed the jury not to consider the facts in the questions that the witness declined to answer, and that any error not objected to in the charge does not require reversal of defendant's conviction.

I.

A.

In July 2000, a Burlington County Grand Jury indicted defendant, Ronald Burns, with first-degree murder, *N.J.S.A.* 2C:11–

3a(1) and (2) (count one); second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a (count two); third-degree unlawful possession of a weapon (handgun), *N.J.S.A.* 2C:39–5b (count three); and third-degree hindering apprehension of another, *N.J.S.A.* 2C:29–3a(2) (count four). Codefendant Tony Felder was also charged in counts one through three of the indictment.

Felder is defendant's first cousin and was eighteen-years old at the time of the incident. He began selling drugs for defendant when he was fifteen-years old. Prior to trial, Felder pled guilty to aggravated manslaughter and agreed to testify against defendant.

At trial, the State presented evidence to show that defendant and Ronald Patterson, Jr. were rival drug dealers in Mt. Holly. Defendant sold drugs from Bobby Bryant's house at 112 Joseph Place, while Patterson sold drugs in front of his cousin's house at 126 Joseph Place. Because Patterson was selling a better quality of cocaine product, Patterson caused defendant's business to decline. Defendant was upset with Patterson and, in April 1999, he initially raised the thought of killing Patterson.

On Labor Day, September 6, 1999, Felder was smoking marijuana and watching television in defendant's apartment when defendant said he wanted Patterson dead. Felder said he would kill Patterson that night. Defendant had previously given a gun to Bryant and told Felder to use the gun Bryant had in his possession. Although defendant did not offer to pay Felder for killing Patterson, Felder understood that defendant would protect him after the shooting.

Around 8 p.m., defendant's girlfriend drove defendant and Felder to Bryant's house at 112 Joseph Place where they met Bryant, Tifani Young, Lawrence Hightower, and others. At some point, defendant whispered to Felder, "You gonna kill him?" Felder responded, "Yeah." Felder entered Bryant's house to get the gun, but Bryant said he did not have it. When Felder reported to defendant that Bryant did not have the gun, defendant went into the house and returned with the gun. Defendant placed the gun

in Felder's left jacket pocket. Because Felder was right-handed, Felder switched the gun to his right pocket.

As Felder started to leave, Young stopped him and asked what he was doing. Defendant told Young to mind his own business. Felder then crossed the street, approached Patterson and his father, and attempted to fire the weapon through his jacket, but the gun failed to discharge. Patterson was unaware of Felder's attempt to shoot him. Felder returned to Bryant's house and told defendant that the gun misfired. Defendant took the gun, removed the clip, unjammed the gun, handed it back to Felder, and told Felder to kill Patterson. Bryant and Hightower saw defendant unjam the gun and hand it back to Felder. Felder again approached Patterson. This time the gun operated. Felder shot Patterson several times before poking him in the head and saying, "I got the last laugh." Patterson's father was nearby and threw a stick at Felder, who fled the scene.

Felder threw the gun in a nearby lake and rode a bike to the location where he had planned to meet defendant. Felder met Young and defendant, who left to get a ride. Young then made arrangements with Curtis Calhoun to drive them to defendant's apartment in Burlington. A short while later, defendant and Young returned in Calhoun's car.

According to Calhoun, he was sitting on a friend's porch that evening when he heard five or six shots. He remained there a short while before leaving. On his way home, Calhoun ran into Young who asked him for a ride, and Calhoun agreed to drive him to Burlington. Calhoun picked up Young and defendant, and drove them to another location to pick up Felder. Calhoun heard Young state that they should have physically fought with Patterson instead of shooting him. Defendant disagreed and told Calhoun to drive to defendant's apartment. At the apartment, defendant exited the car, entered his apartment, and returned with the keys to his girlfriend's car. Young and Felder eventually entered defendant's vehicle, and Calhoun drove away.

Defendant proposed that they go to a strip club in Philadelphia and use that as an alibi. However, before they reached the club, the car had a flat tire. After fixing the flat tire, defendant decided to drive Felder to his grandmother's house. Defendant gave Felder fifty dollars and said he would get back to him in a couple of days.

Bryant testified that following a break-in of his home, defendant gave him a nine-millimeter, semi-automatic gun for protection. Bryant said that shortly before the murder, defendant told him that he needed his gun. Bryant went upstairs, retrieved the gun from under his mattress, put it in his pocket, and returned downstairs. He signaled to defendant that the gun was in his pocket, and defendant removed the gun. Bryant returned inside and did not see what, if anything, defendant did with the gun. A short while later, Bryant saw Felder walk over to where Patterson was standing, remain there about one minute, and return to the group. Bryant observed Felder huddle with defendant just before defendant unjammed the gun and handed it back to Felder. Bryant saw Felder walk away and, five minutes later, he heard gunshots.

Hightower was eighteen-years old at the time of the incident. Hightower testified that he was at Bryant's house on Labor Day when defendant and Felder arrived. A few minutes later, Young joined them. Hightower heard defendant say that he wanted Patterson dead. Fifteen minutes later, Hightower heard Felder ask for a gun. Hightower saw defendant and Felder follow Bryant into Bryant's house and return a couple of minutes later. Hightower claimed that Felder walked over to where Patterson and his father were standing, but returned shortly thereafter and said the gun jammed. Hightower observed Felder as he handed the gun to defendant, who unjammed it and gave it back to Felder. Felder then walked back to Patterson's location. Hightower next heard shots and saw Patterson's father chasing Felder.

The police were called. Detective Thomas Mastrangelo testified that when he arrived at the scene the victim's father was dis-

traught. As Detective Mastrangelo escorted the father to the car, the father accused Felder of shooting his son. He said that Felder had been with defendant and others at Bryant's house. Patterson was taken to the hospital where he died from multiple gunshot wounds to the chest and abdomen.

A few days after the murder, Felder met with defendant, Bryant, and another cousin in Philadelphia. Felder asked for money, and Bryant gave him $700. Two weeks later, Bryant gave Felder $1000 that he claimed he received from the sale of cocaine that Felder had left at Bryant's house.

When Felder was arrested in Scranton, Pennsylvania, he confessed that he shot Patterson. Felder consented to allow the State to tape record a telephone call he agreed to make to defendant. Felder then telephoned defendant. Felder blamed defendant for his predicament, and asserted that he killed Patterson for defendant and received nothing in return. Defendant replied that Felder should not be talking like that. During the conversation, defendant mentioned that Young had told the police the entire story, including that defendant had unjammed the gun. Felder asked defendant how business was, and defendant replied it was "lovely."

Defendant testified in his defense. He admitted that he was at Bryant's house on the evening of the shooting, but he denied any involvement in Patterson's death. He claimed that Felder was already at Bryant's house when he arrived, and that Felder looked "mad" and would not speak to him. After Felder left the group and walked up Joseph Street, defendant heard gunshots. Defendant asserted that he never requested nor encouraged Felder to shoot Patterson. He further denied that he provided the gun to Felder or that he unjammed it. The defense tried to blame Bryant for Patterson's death because Bryant disliked Patterson.

## B.

We turn now to recite the trial procedure necessary to place the legal issue in context. During the police investigation of the

shooting, Young gave three statements to the police, each one indicating that he thought defendant told Felder to kill Patterson and that, on the night of the murder, he saw defendant unjam the gun for Felder.

At trial, prior to Young's testimony, the prosecutor told the trial court that within the last three weeks, Young confirmed the truth of his prior statements to the police but refused to speak to the prosecutor in preparation for trial. The prosecutor asked the court if he could treat Young as an adverse witness during questioning. The trial court denied that request. Young was sworn in before the jury and immediately informed the court that he would not testify against defendant or Felder because they were his relatives. Defense counsel requested a sidebar conference. The trial court then instructed the jury that

the fact that Mr. Young said what he just said should not affect your impartiality ‑one way or the other in this case. Do you understand? There is no inference that you should draw either for the State, against the State, for [defendant] or against [defendant] as a result of what Mr. Young said.

At sidebar, defense counsel explained that he found it problematic that Young mentioned his relationship with defendant. The prosecutor replied that, although Young was under pressure from his family not to testify, he confirmed the substance of his statements and told the police that "he would follow through and ... do the right thing." Defense counsel agreed that Young should be questioned outside the jury's presence. Defense counsel and the prosecutor agreed that the trial court could order Young to testify.

Young was then questioned outside the presence of the jury. When the prosecutor proposed to play the tape recorded statements that Young had made to the police, Young stated that he did not have to answer the questions because he would not testify and he questioned why he should have to listen to the tape. The court explained, "It's for the sake of creating a record. The contempt will come into play, Mr. Young, if at all, if you refuse to testify to a specific question in front of the jury."

During the questioning, Young admitted his statements to the police were true, and he responded to most of the prosecutor's questions. At various times, however, Young indicated that he did not know whether he would answer the same questions before the jury. Finally, Young refused to answer any more questions from the prosecutor, but he agreed to answer defense counsel's questions. Brief cross-examination followed. The trial court ordered Young to testify before the jury. The court also ruled that the prosecutor was permitted to ask leading questions before the jury in those areas that Young was uncooperative.

The jury returned to the courtroom. Young answered the prosecutor's questions regarding his plea, sentence, and his familial relationships to defendant and Felder, but he refused to answer questions concerning the influence that defendant had over Felder. The prosecutor presented Young with part of his prior statement to refresh his recollection on the issue of control. Young refused to comment. The prosecutor asked Young for his reason for not responding, and Young replied that he just refused to answer. The prosecutor then asked Young several other questions that he answered. Young, however, refused to answer questions about Felder entering Bryant's house to obtain a weapon. At one point, Young said that he would not answer any more questions. The trial court ordered Young to testify and questioning continued. Young answered some questions, but refused to answer others concerning defendant.

Defense counsel requested a sidebar and said, "My concern is he is making a record refusing to answer certain critical questions[, w]hich, if he refuses to answer to me, will affect my ability to cross-examine him on the issues." The court replied:

That's the way the process works. But he is answering some and he is not answering others. So it's impossible. If this was a continued course of no answer, then perhaps in a few more minutes I would agree with your point. But at this point he is answering some. He is not answering others.

It's impossible at least for me to predict he was going to answer, he was not going to answer. And, indeed, you are going to have the right to cross-examine

him on everything if you wish. Even those areas that he's refused to answer if you want.

Defense counsel responded:

My problem is if he is not answering questions with respect to when the prosecutor is asking questions, there is going to be an instruction that questions are not evidence. The problem is that information is going to be before the jury. Like with respect to questions as far as did you leave the scene with [defendant].

The court replied that the jury would be instructed not to draw any inference whatsoever from anything relating to Young not answering a question. Defense counsel noted that would help.

Young refused to answer whether he received a ride after the shooting; whether he saw something happen that caused him concern just before Felder left Bryant's house; who drove him to Philadelphia on the night of the shooting; who was with him in Philadelphia; whether he discussed an alibi with anyone that night; and whether he told the police that defendant was jealous of Patterson. The prosecutor asked Young if he remembered defendant telling Felder he should have killed Patterson's father to eliminate any witness, and Young answered, "No, that is not what happened. I am not answering that question." At some point during Young's direct examination, the trial court instructed the jury to disregard the facts in any unanswered question unless the jury found the facts from other independent evidence.

During cross-examination, Young answered most of the questions, but refused to answer whether certain people were selling drugs for defendant in the summer of 1999. At one point, the prosecutor objected to defense counsel's questions about topics that Young refused to respond to on direct examination. The court overruled the objection.

On re-direct examination, the prosecutor asked Young if he had informed the police that defendant told Felder to kill Patterson. Young initially said he did not say that and then added he did not recall saying that. After Young was permitted to review a copy of his statement to the police, the following colloquy took place:

PROSECUTOR: Isn't it a fact that your statement to the police on September 15, within nine days of the shooting, your statement to the police ... was, "I don't

really feel as though [Felder] is all responsible even though he pulled the trigger. I believe that ... 90 percent of that was the person that gave the call to do it, you know. I mean, if you don't have no beef with nobody, you ain't going to bother them unless somebody tell you to do it. And I believe that [defendant] told him to do it. And that's my cousin. They both my cousins, [defendant] my older cousin, [Felder] my younger cousin." Isn't that in fact what you told the police?

YOUNG: But I never heard [defendant] tell [Felder] shoot him.

PROSECUTOR: You did say this to the police, though, didn't you, sir?

YOUNG: May I say something, Your Honor?

COURT: Yes.

YOUNG: I said a lot of things because I was mad at both of my cousins. I know [Felder] shot him. That is no secret. I believe that [defendant] probably could have stopped him like I tried to stop him. But I believe that [defendant] didn't stop him. I mean, that's just where I am at with that. I was mad. I said a lot of things out of anger.

PROSECUTOR: So you acknowledge on February—on September 15, you said even though you loved your cousin, that you told the police that you believed that [defendant] told [Felder] to do the killing. That's what you told the police, didn't you?

YOUNG: That's what [Felder] told me.

PROSECUTOR: No, no.

YOUNG: I am not answering that question.

PROSECUTOR: Sir, answer my question.

YOUNG: I am not answering that question.

PROSECUTOR: Excuse me?

YOUNG: I am not answering that question.

PROSECUTOR: You are now saying that your explanation for why you told the police that [defendant] told [Felder] to do it was because you were mad at [defendant], right?

YOUNG: I believe he could have stopped it.

. . . .

PROSECUTOR: The reason that you told the police something that now you are telling us that was false was because ... you were mad at both cousins?

YOUNG: At that time—let me explain this to you. I didn't know that [Patterson] slapped [Felder] which you all told me that.

PROSECUTOR: No. You—

YOUNG: You want to hear me out?

PROSECUTOR: I'd like you to answer my question yes or no.

YOUNG: I am not answering the question.

On re-cross examination, defense counsel established that Young never heard defendant tell Felder to kill Patterson and that his statement to the contrary merely reflected his belief at the

time. The prosecutor then asked Young if knowing that Patterson had slapped Felder a few days before the shooting changed the fact he, Young, told the police that defendant instructed Felder to kill Patterson. Young replied that he was certain that if Felder were slapped, Felder would retaliate. Young refused to answer whether he saw defendant unjam the gun.

At the conclusion of Young's testimony, the trial court reminded the jury that it should draw no inferences from facts contained in questions that Young refused to answer. During this instruction, the court added, "The mere fact that Mr. Young *didn't answer the questions is for your consideration as to the existence of those facts.*" (Emphasis added). Out of the presence of the jury, the trial court found Young guilty of contempt for refusing to answer questions.

During closing arguments, the prosecutor told the jury:

Young cares no more about truth and justice and vindicating what happened out there that day than the man in the moon. He made that very clear to us when he took the oath and said the first things out of his mouth.... He said, "I don't want to testify against this man here for the reasons that," and again, you rely upon your recollection because I don't want to misstate it. You remember what ... Young said. Compare that to what ... Young said to the police on September 15th.

Later in his summation, the prosecutor added that "we didn't [get] much from [Young], but we certainly got enough to really see what the truth really was with ... Young and why ... Young won't testify."

In the final jury instructions, the court repeated the admonition that "[t]he mere fact that an attorney asks a question and inserts a fact or comments or opinions in that question in no way proves the existence of those facts." The jury convicted defendant of murder, possession of a weapon for an unlawful purpose, and hindering apprehension of another, but acquitted him of possession of a weapon. The trial court merged the weapons offense into the murder offense and sentenced defendant to life in prison with a thirty-year period of parole ineligibility for his murder conviction. The court also imposed a consecutive five-year prison term for the hindering apprehension offense.

## C.

Defendant appealed, raising various issues in the brief filed by his attorney and in his supplemental pro se brief. The State filed its initial brief responding only to the brief filed by defendant's appellate counsel. Thereafter, the Appellate Division directed the State to file a supplemental brief addressing the points raised in defendant's pro se brief. After the State complied, the Appellate Division directed both parties to address eleven specific questions regarding whether the trial court erred in admitting the testimony of Young, a hostile State witness who refused to answer certain questions because he did not wish to inculpate defendant. Both parties filed supplemental letter briefs addressing those eleven questions.

In an unpublished opinion, the Appellate Division found no reversible error in the points raised by defendant in his main brief and his pro se brief, but the panel concluded that the trial court committed plain error by permitting Young to testify when it was known that he would not answer questions posed to him. Specifically, the panel held that the trial court should not have permitted the State to present Young's testimony without assurances that he would answer every question because that procedure violated defendant's rights under the Confrontation Clause of the Sixth Amendment. The panel reasoned that Young's position that he would not testify against defendant because of their familial relationship was "analogous to a witness improperly relying on the Fifth Amendment." Although the State was entitled to present the testimony of the witness or to have the witness held in contempt, the panel found that the State was not entitled to have the witness refuse to answer questions in front of the jury because that added critical weight to the State's case. The panel also found that although the trial court properly told the jury it could not infer anything from the facts in unanswered questions, it was error for the court to say that "[t]he mere fact that [the witness] didn't answer the questions [was] for [the jury's] consideration as to the existence of those facts."

The State filed a petition for certification raising the following questions:

(1) Whether the trial court erred in allowing the State to call Tifani Young as a witness without assurances that he would answer every question put to him?

(2) Whether the trial court erred in allowing the jury to hear questions that Young refused to answer?

(3) Whether the trial court correctly instructed the jury regarding its consideration of Tifani Young's refusal to answer certain questions?

Defendant filed a cross-petition contending that the other issues raised in his briefs also warranted reversal of his convictions. We granted the State's petition for certification and denied defendant's cross-petition. 188 *N.J.* 355, 907 *A.2d* 1014 (2006).

## II.

### A.

The State argues that the trial court did not err in allowing the State to call Young as a witness and that it was not prosecutorial misconduct to call Young as a witness after he said he would not answer any questions. The State notes that Young did not attempt to assert a Fifth Amendment privilege and argues that the Appellate Division erred in equating Young's refusal with a Fifth Amendment privilege. The State contends that there was a chance that Young would answer questions before the jury, despite his prior assertions that he would not. The State urges that Young answered many questions posed to him and that the jury would have been deprived of that important testimony if Young had not been permitted to testify. Further, because defense counsel was able to cross-examine Young on the same topics covered by the prosecutor, the State urges that the right of confrontation was not violated.

Moreover, the State argues that none of the questions that Young refused to answer added critical weight to the State's case because it was the probative value of his answers, rather than the content of the question, that helped to convict defendant. The State asserts that although Young refused to answer questions

about seeing defendant unjam the gun, Young's statement to the police regarding that issue and the taped phone conversation between Felder and defendant in which defendant complained that Young told the police that defendant unjammed the gun were admitted into evidence.

Lastly, the State argues that the trial court correctly instructed the jury regarding its consideration of Young's refusal to answer certain questions. Because defendant failed to object to the trial court's instructions, the State contends that the court's statement that "[t]he mere fact that Mr. Young didn't answer the questions is for your consideration as to the existence of those facts," was not reversible error in light of the accuracy and clarity of the jury instructions as a whole.

### B.

In contrast, defendant argues that it was a violation of his right to a fair trial for the State to call Young as a witness knowing that he intended to refuse to answer some questions. He contends that the State failed to inform the court that Young would not fully testify and that it is inconsequential that Young's partial refusal to testify was not based on a constitutional privilege because the prejudice is the same. Defendant also claims that the State improperly used to its advantage Young's refusal to answer by including Young's prior statements in questions the State knew Young would not answer. Defendant asserts that by permitting Young to decide whether to testify in front of the jury, the trial court allowed the jury to improperly infer that Young's testimony would be harmful to defendant. He argues that he was prejudiced because, other than Felder, Young was the only person who implicated him in Patterson's shooting, and the logical inference from Young's refusal to testify supported a guilty finding. Defendant adds that the jury instructions were inadequate because they failed to provide a specific warning not to draw inferences from Young's refusal to answer and improperly allowed the jury to consider Young's refusal to answer when determining facts.

III.

A.

 We first examine the State's related arguments that the trial court properly permitted the State to call Young as a witness after Young stated that he would not answer questions about defendant's conduct. Preliminarily, we emphasize that this case does not involve a witness's invocation of a constitutional privilege in the presence of the jury. If this had been a witness who asserted a constitutional privilege, the trial court would have been required to conduct a hearing out of the presence of the jury to determine the validity of the privilege. *State v. Jamison,* 64 *N.J.* 363, 373–74 n. 1, 316 *A.*2d 439 (1974); *see United States v. Bryan,* 339 *U.S.* 323, 332, 70 *S.Ct.* 724, 731, 94 *L.Ed.*2d 884, 891 (1950). That same procedure should occur, when as here, the witness does not invoke a constitutional privilege for refusing to testify. However, because this case does not involve an asserted constitutional or statutory right to refuse to testify, we apply an abuse of discretion standard to the trial court's treatment of the evidentiary issues. *Brenman v. Demello,* 191 *N.J.* 18, 31, 921 *A.*2d 1110 (2007).

 "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States,* 384 *U.S.* 364, 370, 86 *S.Ct.* 1531, 1535, 16 *L.Ed.*2d 622, 627 (1966). Whenever the court is informed that a witness may not respond to questions, the trial court should conduct a hearing outside the presence of the jury to attempt to determine whether the witness will testify. *Jamison, supra,* 64 *N.J.* at 373–74 n. 1, 316 *A.*2d 439. If the court determines that the witness has no valid right to refuse to testify, the court should order the witness to testify and, if the witness refuses, the witness may be held in contempt and imprisoned until he or she testifies. *Shillitani, supra,* 384 *U.S.* at 370, 86 *S.Ct.* at 1535, 16 *L.Ed.*2d at 627. The court "should always keep the door open for a decision by the witness to testify rather than discourage it," even when the

witness "has indicated a contrary intent." *Jamison, supra,* 64 *N.J.* at 379, 316 *A.*2d 439.

The prediction that a witness will not testify is not "the equivalent of the actual scenario where a witness has appeared in court and refused to testify after a court order." *United States v. Inadi,* 748 *F.*2d 812, 820 (3d Cir.1984), *rev'd on other grounds,* 475 *U.S.* 387, 106 *S.Ct.* 1121, 89 *L.Ed.*2d 390 (1986). Notably, once a recalcitrant witness is on the stand, the witness may change his or her mind and decide to testify. The United States Supreme Court explained that if the decision to testify were reposed in the witness then "the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity." *Bryan, supra,* 339 *U.S.* at 331, 70 *S.Ct.* at 730, 94 *L.Ed.*2d at 891.

Once a witness refuses to testify, the trial court should instruct the jury not to draw any inference against the defendant from that refusal. A proper jury instruction should cure situations where objectionable inferences would otherwise be deemed prejudicial. *Namet v. United States,* 373 *U.S.* 179, 187, 83 *S.Ct.* 1151, 1155, 10 *L.Ed.*2d 278, 284 (1963).

We recognize that even when appropriate jury instructions are given, there may be occasions when a witness's refusal to testify will be unduly prejudicial to a defendant. A reviewing court should consider all of the surrounding circumstances to determine whether the conduct of the witness requires a new trial. In making that determination, courts generally focus on two factors. *Id.* at 186, 83 *S.Ct.* at 1154, 10 *L.Ed.*2d at 283. "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186, 83 *S.Ct.* at 1154–55, 10 *L.Ed.*2d at 283. "A second theory . . . rest[s] upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to

the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 *S.Ct.* at 1155, 10 *L.Ed.*2d at 284.

## B.

We turn now to address whether there was misconduct in the prosecutor's decision to call Young as a witness. The State urges that the prosecutor could not assume that Young would refuse to testify and appropriately informed the court that Young was "not happy about being here today" before asking the court for permission to treat Young as a hostile witness.

Young was an important witness for the State. He was present with defendant and Felder both before and after the shooting. Although the prosecutor knew that Young was hesitant to testify, the prosecutor was also aware that Young indicated to representatives of the Prosecutor's Office a few days before trial that he would "do the right thing," implying he would testify. The witness's potential to refuse to testify did not prohibit the prosecutor from calling the witness to testify. Presented with those conditions, we find no misconduct in the prosecutor's effort to have Young testify.

Nor do we find any abuse of discretion by the trial court in allowing Young to take the stand to be questioned before the jury. Out of the presence of the jury, the court warned Young that he would be held in contempt if he refused to testify. In light of Young's equivocation, there was a chance that, despite his reluctance, he would answer all questions before the jury. In fact, Young oscillated among answering some questions, not remembering the answers to other questions, and not answering some questions. Because parts of Young's testimony implicated defendant in Patterson's murder, the State was entitled to present that evidence to the jury.

Notably, the trial court properly instructed the jury to disregard the conduct of the witness and not to draw any infer-

ences from the witness's refusal to testify. Later, when Young refused to answer specific questions, the trial court appropriately instructed the jury not to consider the facts within those questions unless the jury found those facts from other evidence. One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions. *State v. Nelson,* 155 *N.J.* 487, 526, 715 *A.*2d 281 (1998), *cert. denied,* 525 *U.S.* 1114, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999).

Also, the prosecutor's comments in summation encouraged the jury to compare Young's testimony with his prior statements to the police. That was fair comment. Although the prosecutor's comment that "we certainly got enough [from Young] to really see what the truth really was with [him] and why [he] won't testify" may have been a subtle effort to convince the jury to infer that Young refused to answer certain questions because the answers would be detrimental to defendant, the trial court instructed otherwise. We do not find that any minor transgression by the prosecutor rose to the level of prosecutorial misconduct.

### C.

The more difficult issue is whether Young's refusal to answer specific questions added critical weight to the State's case that unfairly prejudiced defendant. Before addressing the circumstances of this case, we review several other decisions that have considered that issue in the context of a witness's refusal to testify based on an asserted Fifth Amendment privilege.

In *McBride v. State,* 477 *A.*2d 174, 177 (Del.1984), the defendant was tried for the murder of her husband. Frank Ross, who actually stabbed the victim to death, had previously testified in his defense at his trial. *Id.* at 178, 180. The prosecutor called Ross to testify against the defendant. *Id.* at 180. After answering several preliminary questions, Ross accused a third person, Robert Kreider, of planning the murder and stated that Kreider received a deal to testify against the defendant. *Ibid.* When asked if he killed the victim, Ross pled the Fifth Amendment

privilege against self-incrimination. *Ibid.* The defendant was convicted. *Id.* at 177. On appeal, the Delaware Supreme Court found that, in light of the evidence that included two other witnesses who implicated the defendant in the crime, along with the defendant's admission of her complicity in the crime, *id.* at 188, Ross's "limited testimony or any inference that may have been drawn from his invocation of the Fifth Amendment [did not] add[ ] 'critical weight' to the [State's] case," *id.* at 187.

The Minnesota Supreme Court reached a similar conclusion in *State v. Black*, 291 *N.W.*2d 208 (Minn.1980), *cert. denied*, 454 *U.S.* 847, 102 *S.Ct.* 164, 70 *L.Ed.*2d 134 (1981). In that case, in separate trials, the defendant and his accomplices, Jean Link and Dale Olson, were convicted of first-degree murder for the fatal burning of the victim and her two children. *Id.* at 210. Link had testified at her own trial that she would testify at the defendant's trial. *Id.* at 212. Later, Link refused to testify at Olson's trial, and when called as a witness at the defendant's trial, she refused to answer any questions. *Ibid.* The court considered all of the circumstances including Link's prior statements that were introduced into evidence, along with other corroborating evidence to conclude that "Link's refusal [was] not so prejudicial as to require a new trial." *Id.* at 213; *see also Namet, supra*, 373 *U.S.* at 189–90, 83 *S.Ct.* at 1156, 10 *L.Ed.*2d at 285–86 (noting inferences raised by questions that witnesses declined to answer were at most cumulative and not prejudicial); *Commonwealth v. Kane*, 388 *Mass.* 128, 445 *N.E.*2d 598, 604 (1983) (finding no critical weight in witness refusal to answer what defendant told him because State presented strong circumstantial case, and court instructed jury "to draw no inferences, for or against the defendant"). *But see State v. Jordan*, 197 *N.J.Super.* 489, 501, 485 *A.*2d 323 (App.Div.1984) (holding that witness's claim of Fifth Amendment privilege before jury and prosecutor's comment on witness's silence as "an attempt to conceal" was unduly prejudicial).

In making the critical weight evaluation, a court should look at the strength of the State's case against the defendant. Here, the

Appellate Division concluded that Young's refusal to answer questions concerning the following topics added critical weight to the State's case:

> whether [defendant] had a lot of control over Felder; whether [Young's] prior statement implicating [defendant] refreshed his recollection; whether [defendant] was jealous of the victim; whether [Young] told the police that he believed [defendant] told Felder to shoot the victim; whether he told the police that "[t]hey took a life . . . and they did something that can't be justified . . . .;" whether he told the police that he had seen a gun; whether he told the police that he had seen [defendant] unjam the gun.

██ We review each of those instances of Young's refusal to testify to determine whether his refusals added critical weight to the State's case. In doing so, we note that the prosecutor is permitted to ask questions in an effort to prove the State's case and to explore the inconsistencies between a witness's prior statements and his trial testimony. When faced with inconsistencies between a witness's trial testimony and the witness's prior statements, if appropriate, a prosecutor may read the relevant portions of the witness's statements as prior inconsistent statements under *N.J.R.E.* 613 and 803(a)(1). *See State v. Benthall,* 182 *N.J.* 373, 379, 865 *A.*2d 693 (2005); *State v. Brown,* 138 *N.J.* 481, 544, 651 *A.*2d 19 (1994) (concluding that "constitutional confrontation guarantees are not violated by a witness's lack of recollection regarding an introduced prior statement or the events described in such a statement"), *overruled on other grounds by State v. Cooper,* 151 *N.J.* 326, 361, 700 *A.*2d 306 (1997).

██ On the issue of defendant's influence and control over Felder, Young testified that he talked to the police in September 1999 about whether defendant "had control over [his] family," but could not recall what he said. After the prosecutor sought to refresh Young's memory by showing his statement to him, Young refused to answer. In light of Young's inconsistent testimony, the trial court properly permitted the prosecutor to use Young's statements to the police on that issue.

██ On the issue of defendant's jealousy of the victim, the prosecutor asked Young if defendant was jealous of the victim's

car. Young replied that he did not know. Because that response was inconsistent with Young's February 1, 2000 statement to the police in which Young stated that "[defendant] was jealous of [the victim] because [the victim] was makin' money and just bought a Lexus," the prosecutor showed Young his prior statement. Young then refused to answer. Again, the trial court permitted the prosecutor to offer before the jury that portion of Young's February 1, 2000 statement as a prior inconsistent statement. We find no abuse of discretion in that ruling by the trial court.

■ We next review the evidence concerning the references that defendant told Felder to shoot the victim and whether Young told the police that defendant and Felder unjustifiably took a life. When the prosecutor asked Young if he made that statement, Young said that he did not recall saying that. Young then explained that he was upset with defendant and Felder, indicating that he "said a lot of things out of anger" and "believe[d] [defendant] could have stopped it." Because Young's responses were inconsistent with his September 15, 1999 statement to the police, the prosecutor asked Young if he said: "I was just kind of paranoid at first, you know. You was talking about my family that I grew up with ... but they took a life ... and they did something that can't be justified." After the prosecutor asked Young if he made that statement because he was mad at both of them, Young replied that it was obvious that Felder shot the victim. Young refused to answer any more questions.

On re-cross examination, Young explained that when he gave his statements to the police, he was not aware that Felder had a gripe with Patterson. He indicated that he later learned that Patterson had slapped Felder in the head. Young made it clear that he never heard defendant tell Felder to kill the victim and that when he made his statement on September 15, it was his belief that defendant "told him to do it." Young explained that he was angry at defendant and Felder because the death of Patterson placed the entire family at risk from retaliation. The prosecutor then asked Young whether his belief that Patterson slapped Felder several

days before the incident changed the fact that Young told the police that defendant asked Felder to kill the victim. Young explained that "I know [Felder] and I know for a fact that if you slap him, he is going to do something to you." Viewing this line of questioning and Young's answers, it is evident that Young answered most of the questions and attempted to clarify his earlier statements. Under those circumstances, the specific questions that Young declined to answer did not add critical weight to the State's case.

An important area of Young's testimony dealt with the murder weapon. The Appellate Division expressed concern that Young's refusal to answer questions about the gun could have supported the inference that defendant initially handed the gun to Felder. According to the panel, defendant's guilt was more evident if the jury believed that defendant handed the gun to Felder. However, the prosecutor did not ask Young if defendant gave the gun to Felder but asked whether he saw defendant unjam the gun. Young responded that he was not sure. Coupled with the vast evidence that defendant unjammed the gun just prior to Felder using the gun to shoot Patterson, we find no critical weight in Young's refusal to answer specific questions about the gun.

We point out one other occasion when Young did not fully answer a question. The prosecutor asked Young if during the ride in Calhoun's car, he remembered defendant criticizing Felder for not shooting Patterson's father who witnessed the shooting. Young said "no" and the prosecutor again asked the question. Young stated, "[n]o, that is not what happened" and refused to answer any further questions on that topic. At sidebar, the trial court ruled, without objection, that Young's testimony was inconsistent with his February 1, 2000 statement in which Young said he heard defendant tell Felder that he should have killed Patterson's father to leave no witnesses. The court ruled that portion of Young's February 1, 2000 statement was admissible.

■ When faced with Young's inconsistent trial testimony and his prior statements to the police, the trial court did not abuse its discretion in allowing the prosecutor to read the relevant portions of Young's statements as prior inconsistent statements under *N.J.R.E.* 613 and 803(a)(1). As the trial court noted, Young answered some questions but not others. The court could not predict when he was going to answer and when he was not. Defense counsel was able to cross-examine Young on all issues covered by the prosecutor's questions and even some areas that Young declined to answer for the prosecutor. Faced with a recalcitrant witness who answered most questions, but declined to answer others that directly related to defendant, we find no abuse of discretion in the trial court permitting both sides to examine the witness. It is for the jury to observe the witness and determine which account of the witness's statements and testimony is true.

■ Significantly, Young's testimony, including portions of his written statements, was only part of the substantial evidence against defendant. Felder, Hightower, and Bryant testified that they saw defendant unjam the gun and hand it to Felder prior to Felder leaving to shoot the victim. Additionally, the January 28, 2000 recorded telephone conversation between Felder and defendant was admitted into evidence. During that conversation, defendant complained to Felder that Young had gone to the police and told them that defendant had helped Felder unjam the gun. The record contains the testimony of numerous witnesses who testified that defendant disliked the victim, his attempts to have the victim killed, his unjamming of the gun after Felder's unsuccessful attempt to shoot Patterson, and his assistance to Felder in fleeing the scene of the crime. Based on the overwhelming evidence of defendant's role in the shooting of Patterson, the proper admission of Young's prior inconsistent statements, and the lack of objections to the trial court's instructions to the jury, we conclude that Young's refusal to testify to certain questions did not add critical weight to the State's case in a form not subject to cross-examination that unfairly prejudiced defendant.

## IV.

Finally, we address the charges to the jury. Defendant urges that the Appellate Division appropriately found reversible error in the court's instructions to the jury regarding its consideration of Young's testimony and his refusal to answer certain questions.

Because defendant did not object to the jury instructions at trial, we must apply the plain error standard. *R.* 2:10–2; *State v. Torres,* 183 *N.J.* 554, 564, 874 *A.*2d 1084 (2005). We will reverse on the basis of unchallenged error if we find error that was "clearly capable of producing an unjust result." *R.* 2:10–2. In the context of a jury charge, plain error requires demonstration of "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (citations omitted). We consider alleged error in light of "the totality of the entire charge, not in isolation." *State v. Chapland,* 187 *N.J.* 275, 289, 901 *A.*2d 351 (2006). We have recognized that error in a jury instruction that is "crucial to the jury's deliberations on the guilt of a criminal defendant" is a " 'poor candidate[ ] for rehabilitation' under the plain error theory." *Jordan, supra,* 147 *N.J.* at 422, 688 *A.*2d 97 (citation omitted). Nevertheless, any alleged error also must be evaluated in light "of the overall strength of the State's case." *Chapland, supra,* 187 *N.J.* at 289, 901 *A.*2d 351.

Here, when Young initially refused to testify, the trial court informed the jury that the witness's refusal to testify "should not affect your impartiality one way or the other in this case. Do you understand? There is no inference that you should draw either for the State, against the State, for [defendant] or against [defendant] as a result of what Mr. Young said." Later, during Young's testimony, the court told the jury:

There are [a] number of questions in which facts were contained in them to which this witness said he is not answering the question. Any questions that contain

facts in the question itself—just by the mere fact that a question contains facts, doesn't mean that those facts exist. If you find unless the witness, of course, acknowledged it and unless, of course, the witness in a credible fashion as you determine testified to those facts before you.

You may, of course, find that those facts exist from other independent sources and from other witnesses. But throughout the course of the afternoon there have been questions asked ... in which facts were contained. Just by the mere fact that those questions contain facts is of no moment to your ultimate finding in this case.

After the conclusion of Young's testimony, the court reminded the jurors:

I do not want you to draw any inference about facts that were contained in the questions that ... Mr. Young refused to answer. Many of the questions contained facts. You may find from independent sources, from independent witnesses, from exhibits in the case or from other evidence in the case that the facts that were contained in the questions either did exist or don't exist. Depending upon your assessment of those facts. Depending upon your evaluation of those exhibits.

If you believe, as in other instances, that the State has proven beyond a reasonable doubt the existence of those facts, then you should find the existence of those facts. Conversely, if you believe that the State hasn't proven the existence of those facts beyond a reasonable doubt, then you should not find the existence of those facts. *The mere fact that Mr. Young didn't answer the questions is for your consideration as to the existence of those facts.* Do you understand that?

Finally, I have sustained objections to questions asked ... which may have contained statements of certain facts. And you heard that. It occurred this afternoon much more than it had prior to this afternoon. The mere fact that someone asks a question and inserts facts or comments or opinions in that question in no way proves the existence of those facts. You will only consider such facts which, in your judgment, have been proven to you beyond a reasonable doubt by the State by the testimony of witnesses or from exhibits admitted into evidence by the Court.

[ (Emphasis added.) ]

In the final jury instructions, the court again cautioned:

On various occasions during the course of the trial, I have sustained objections to some questions asked by counsel which may have contained statements of certain facts. I had a discussion with you about that on one occasion if you remember. The mere fact that an attorney asks a question and inserts a fact or comments or opinions in that question in no way proves the existence of those facts. You shall only consider such facts which in your judgment have been proven by the testimony of witnesses or from the exhibits that ... have been admitted in evidence and that you'll take with you into the jury room.

Defendant did not object to any of those jury instructions. He now objects to the emphasized portion of the charge noted above.

The State does not dispute that the quoted portion of the charge is unclear, if not error.

Viewing the charges as a whole, it is apparent that the trial court intended to say that "[t]he mere fact that Mr. Young didn't answer the questions is [*not*] for your consideration as to the existence of those facts." (Emphasis added). We have no way of determining whether the trial court simply misspoke, or whether there is an error in the transcript. Notably, both prior to and after that comment, the trial court clearly informed the jury that, unless the jury found the facts from the evidence, it should not draw any inference about facts contained in the questions that the witness refused to answer.

The failure of either defendant or the State to object to the inappropriate comment in the jury charge influences our view that the jury understood it could only consider evidence that the witness testified to, that it could not draw any inference for or against defendant for the witness's refusal to answer certain questions, and that it was not to consider facts in questions that the witness did not answer. We conclude that, viewing the instructions as a whole, and in light of the overwhelming evidence of defendant's guilt, the brief inadvertent error in the instructions does not require a new trial. In short, that error was not "of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2; *Chapland, supra,* 187 *N.J.* at 289, 901 *A.2d* 351.

## V.

The judgment of the Appellate Division is reversed. We remand to reinstate the judgment of conviction.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.