988 A.2d 104 (2010)
411 N.J. Super. 521
STATE of New Jersey, Plaintiff-Respondent,
v.
Dashawn MILLER, aka Darrel T. Miller, Defendant-Appellant.
No. A-3094-08T4.
Superior Court of New Jersey, Appellate Division.
Submitted January 5, 2010.
Decided February 9, 2010.
*107 Yvonne Smith Segars, Public Defender, attorney for appellant (Stephen A. Caruso, Assistant Deputy Public Defender, of counsel and on the brief).
Paula T. Dow, Essex County Prosecutor, attorney for respondent (Sara A. Friedman, Assistant Prosecutor, of counsel and on the brief).
Before Judges WEFING, GRALL and LeWINN.
The opinion of the court was delivered by
GRALL, J.A.D.
A jury found defendant Dashawn Miller guilty of conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1, two counts of first-degree robbery, N.J.S.A. 2C:15-1, second-degree burglary, N.J.S.A. 2C:18-2, third-degree unlawful possession of a sawed-off shotgun, N.J.S.A. 2C:39-3b, second-degree possession of a firearm, the sawed-off shotgun, with the purpose to use it unlawfully, N.J.S.A. 2C:39-4a, and fourth-degree resisting arrest, N.J.S.A. 2C:29-2a. Defendant's convictions for conspiracy and possession of a firearm with an unlawful purpose were merged with his convictions for first-degree robbery.[1] The judge sentenced *108 defendant to an aggregate term of twenty-eight years, subject to periods of parole ineligibility and parole supervision mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The aggregate sentence includes consecutive fourteen-year terms for the first-degree robberies and concurrent terms within the statutory range for burglary, possession of a sawed-off shotgun and resisting arrest. The mandatory fines, penalties and assessments were imposed.
We affirm defendant's convictions and sentence but remand for correction of the judgment of conviction, which erroneously reports defendant's conviction for second-degree burglary as a conviction for second-degree robbery and misstates the aggregate sentence and the NERA parole term on one count of first-degree robbery.
On the afternoon of October 9, 2007, Benjamin Pichaya, Milton Dominquez and Alfredo Cortez were installing hardwood flooring in a new multi-family residence in Irvington. Defendant and a juvenile entered the room in which they were working. Defendant, the heavier set of the two intruders, pointed a gun at the workmen and directed them to put up their hands. While defendant held the gun, the juvenile took sixty dollars from Pichaya and forty dollars from Dominquez. Cortez was also searched, but he did not have any money. The juvenile handed the money he retrieved to defendant. Both of the intruders were wearing white t-shirts and red hats.
The intruders left the house. Pichaya and Dominquez called the police, but the call was disconnected. They used a cell phone to contact their boss; he stayed on the line while Pichaya and Dominquez followed the intruders and described their location. When police cars arrived, the workers returned to their job site.
Officer Kelly, who had received a report of a robbery involving a gun committed by two men wearing white t-shirts and red hats, spotted defendant and his companion. Defendant was also wearing a white jacket. Officer Kelly stopped the police car, jumped out and ordered the men to get on the ground. The juvenile put his hands up, but defendant ran. Officer Kelly restrained the juvenile and noticed that defendant was holding something under his jacket. As defendant ran north on 20th Street, Officer Kelly saw him take off his jacket and throw something in a bush beneath a tree. Defendant then ran east, through "yards" and toward 19th Street.
Officer Love arrived while Officer Kelly was handcuffing the juvenile. He left to look for defendant on 19th Street. He noticed a man wearing a white t-shirt and red hat stooped over in a yard with tall bushes and grass. Officer Love arrested him.
Officer Kelly retrieved the gun, and Officer Marino, who came to assist Kelly, retrieved the white jacket. At the time of their arrest, defendant and the juvenile had about twenty-three dollars in cash. Although the officers looked, they did not find additional cash in the area.
Officer Zepeda, who had gone to the scene of the crime to interview the victims, took Pichaya and Dominquez to the spot where the suspects were detained. They identified defendant and the juvenile. Neither of the victims was able to identify defendant at the time of trial, but both acknowledged their out-of-court identifications *109 and both identified the shotgun recovered by Officer Kelly.
Sergeant Gaines, a ballistics expert employed by the Essex County Sheriff's Office, tested the shotgun and determined that it was operable. The barrel of the shotgun is seven and three-quarters inches long and the gun's total length is fourteen and one-half inches, sufficiently short to qualify the firearm as a "sawed-off shotgun," N.J.S.A. 2C:39-1o.
Defendant elected not to testify or present any witnesses.
During deliberations, the jury requested "a read back or playback of Pichaya's testimony." Because the courtroom is equipped with a video-recording system, the judge determined that it was appropriate to respond to the request by playing the portion of the videotape that contained Pichaya's testimony. The judge arranged for the jurors to see and hear the video in the courtroom and in the presence of the judge, the prosecutor, defense counsel and defendant. In making that ruling, the judge noted that the videotape was the official court record. He also determined that because the defendant had not presented any witnesses, there was no risk that the replaying of the testimony the jurors asked to hear would undercut conflicting testimony offered by the defense. Defense counsel did not ask the judge to replay the testimony of any other witness.
Defendant raises three issues on appeal:
I. THE COURT BELOW COMMITTED REVERSIBLE ERROR IN PLAYING BACK TO THE DELIBERATING JURY THE VIDEOTAPE OF THE ENTIRE TESTIMONY OF THE STATE'S KEY WITNESS.
II. THE INSTRUCTION ON DEFENDANT'S EXERCISE OF HIS RIGHT TO REMAIN SILENT SUGGESTED THAT HE HAD AN OBLIGATION TO TESTIFY AND THUS VIOLATED HIS STATE AND FEDERAL RIGHTS TO REMAIN SILENT. (Not Raised Below).
III. THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE AND NOT IN CONFORMANCE WITH THE CODE OF CRIMINAL JUSTICE.
The judge did not err by allowing the deliberating jurors to view the videotape of Pichaya's testimony. As a general rule, a deliberating jury's request to hear testimony should be granted. State v. Wilkerson, 60 N.J. 452, 460, 291 A.2d 8 (1972). The same rule applies when the court's record is memorialized in an audio recording, which must be replayed for the jurors when there is no stenographic record to permit a conventional "read back." State v. Middleton, 299 N.J.Super. 22, 30-31, 690 A.2d 623 (App.Div.1997). The decision is one committed to the sound exercise of the trial court's discretion, and this judge's response was not an abuse of that discretion. See State v. Burr, 195 N.J. 119, 133, 948 A.2d 627 (2008) (noting that "the replay, at the jury's request, of videotaped testimony, in its entirety and in open court, is not per se prejudicial and must be subject to judicial discretion").
Defendant's claim of abuse of discretion resulting in prejudicial error is based upon general observations about the different impact of conventional "read backs" and the playing of videotaped testimony. That discussion is found in this court's opinion in State v. Michaels, 264 N.J.Super. 579, 625 A.2d 489 (App.Div.1993), aff'd on other grounds, 136 N.J. 299, 642 A.2d 1372 (1994), and reiterated in Burr, supra, 195 N.J. at 132-34, 948 A.2d 627. Defendant's *110 reliance on the distinction between "read backs" and replay of videotaped testimony and his reliance on Michaels and Burr are misplaced.
Trial judges' decisions about the appropriate response to questions from deliberating jurors for a repetition of trial testimony are considered in the context of the available options and the relative risk of prejudice they entail. See, e.g., id. at 132-33, 948 A.2d 627 (discussing the circumstances and risk of prejudice in Michaels). In Michaels, the jurors asked to see videotaped testimony given by the children who were the alleged victims. 264 N.J.Super. at 642, 625 A.2d 489. A transcript of their testimony was available. Ibid. Nonetheless, the trial judge permitted the jurors to view the videotapes of each child's testimony. Ibid. In that context, the panel in Michaels cautioned "against routine replaying of such testimony." Id. at 644, 625 A.2d 489. The panel directed, that the "trial judge should first seek to satisfy a jury request for playback of videotaped testimony by offering a reading of the transcript of the testimony." Ibid. In the circumstances of Michaels, where a "read back" of testimony was possible, we discussed the risk of prejudice that could have been avoided if a "read back" had been ordered. The panel reasoned:
It is clear that videotaped testimony provides more than [a] conventional ["read back" of] transcribed testimony. The witness' actual image, available in a video replay, presents much more information than does a transcript reading. In essence, the witness is brought before the jury a second time, after completion of the defense case, to repeat exactly what was testified to in the State's case. The witness' words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury.
[Id. at 644, 625 A.2d 489.]
The critical distinction between Michaels and this case is that a "read back" was not an option available to this judge. The trial was conducted in a courtroom in which the proceedings are videotaped rather than memorialized by a stenographer. Thus, a "read back" would not have been possible without an adjournment of sufficient duration to permit preparation of either a transcript or stenographic record of the testimony from the recording.
The fact that a "read back" is not feasible changes the analysis. In evaluating the potential prejudice, the comparison is no longer between the relative impact of hearing an "impartial" reading of the testimony and a reappearance of the witness via videotape. Id. at 644-45, 625 A.2d 489. Assuming that there is an option to replay only the audio portion of the videotape, the comparison is the potential impact of hearing the testimony again in the cadence, tone and voice of the witness and hearing that testimony while also seeing the witness's gestures, body language and facial expressions for a second time. In this context, the additional prejudice inherent in the opportunity to observe the witness a second time is not as apparent as it is when compared with a conventional "read back."
The direction provided in Michaels, which was extended to the replaying of out-of-court-statements that have been videotaped in Burr, supra, 195 N.J. at 134-35, 948 A.2d 627, is that the trial judge should consider whether to satisfy a jury's request for a "playback of videotaped testimony by offering a reading of the transcript of the testimony." 264 N.J.Super. at 644, 625 A.2d 489. On that reasoning, the trial judge may also consider, *111 especially if there is a request for a special procedure, whether the circumstances of a particular case warrant a replay that permits the jurors to hear but not see the witness's testimony. In either event, as Michaels and Burr clearly indicate, the replay is not "prejudicial per se," and the trial judge retains "wide discretion" in determining how to respond to the jury's request. Ibid.
In the trial court, defendant did not ask the court to arrange for a replay of the audio without displaying the video and did not present any argument about prejudice specific to this case. On appeal, his argument is limited to one that rests on a false premise  that the judge had the option of directing a "read back." Given the arguments raised and the options available to the judge, we cannot conclude that the judge chose an unjust course by arranging for the jurors to view the videotape of the testimony they asked to hear again in open court and in the presence of defendant, his attorney, the prosecutor and the judge.
Defendant's objection to the jury instruction on his decision to remain silent lacks sufficient merit to warrant more than brief comment. R. 2:11-3(e)(2). Defendant elected not to testify and to have the judge give the jury direction on his right to remain silent. Because he did not object to the instruction when it was given, he is not entitled to relief unless "`[l]egal impropriety in the charge prejudicially affect[ed his] substantial rights'" and had the "`clear capacity to bring about an unjust result.'" State v. Burns, 192 N.J. 312, 341, 929 A.2d 1041 (2007) (quoting State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997)); see R. 2:10-2. In determining whether an instruction had that capacity, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973); accord State v. Adams, 194 N.J. 186, 207, 943 A.2d 851 (2008); State v. Gartland, 149 N.J. 456, 473, 694 A.2d 564 (1997).
The portion of the jury charge defendant finds objectionable is as follows:
As you know, ladies and gentlemen, the defendant did not testify in this case. The defendant elected not to testify at this trial. It is his constitutional right to remain silent. You may not consider for any purpose or in any manner in arriving at your verdict that [sic] the fact that the defendant did not testify. That fact should not enter into your deliberations or discussions in any manner or at any time. The defendant is entitled to have the jury consider all evidence presented at trial. He is presumed innocent even if he chooses not to testify.
We have no doubt that a jury hearing this clear description could not be confused by use of the word "even" and led to conclude that defendant had an obligation to testify. We recognize that the last sentence of the relevant Model Jury Instruction was revised after defendant's trial and that it now explains that the defendant "is presumed innocent whether or not [he] chooses to testify." Model Jury Charge (Criminal), "Defendant's Election not to Testify" (revised May 4, 2009). Nonetheless, we are persuaded that the charge given in this case, read as a whole, had no capacity to lead the jurors astray. The jurors were clearly directed that they could not consider defendant's decision to leave the State to its proofs in any manner and were not permitted to allow the fact that he did not testify to enter into their deliberations or decision-making at any time.
We turn to consider defendant's objections to the sentence imposed. Defendant *112 was nineteen years old at the time of sentencing. Although he had never been convicted of a crime before, he had an extensive history of juvenile adjudications and was first involved with the juvenile justice system when he was thirteen years old. The crimes at issue here were committed within ten months of the date on which defendant completed service of a parole term imposed as a consequence of a juvenile adjudication.
Defense counsel urged the court to reject the prosecutor's suggestion that defendant's continued insistence upon his innocence demonstrated a lack of remorse favoring a longer sentence of incarceration. In addition, defense counsel asked the judge to consider defendant's age as a factor militating in favor of a sentence at the lower end of the range.
The judge made specific findings relevant to the statutory aggravating and mitigating factors. N.J.S.A. 2C:44-1a-b. He did not rely on defendant's continued assertion of innocence. Rather, focusing on defendant's extensive juvenile record and continued involvement in criminal conduct despite periods of supervision in the community and at Jamesburg, the judge found three aggravating factors  the risk that defendant will commit another crime, N.J.S.A. 2C:44-1a(3); the extent of his prior criminal record and the seriousness of the offenses, N.J.S.A. 2C:44-1a(6); and the need to deter, N.J.S.A. 2C:44-1a(9).
The judge found no mitigating factors. The judge noted the extensive opportunities for rehabilitation afforded to defendant as a juvenile. On that ground, he concluded that concerns about the safety of the community, not defendant's rehabilitation, were now paramount.
"An appellate court is not to substitute its assessment of aggravating and mitigating factors for that of the trial court." State v. Bieniek, 200 N.J. 601, 608, 985 A.2d 1251 (2010). There are additional limitations on this court's appellate review of sentencing. When a judge's findings and reasons for rejecting a mitigating factor are not explicit but can be "deduce[d] from the sentencing transcript," it is inappropriate to remand for clarification of what can be "discern[ed]." Id. at 608, 985 A.2d 1251.
Applying these standards, we see no basis for disturbing the judge's findings on aggravating and mitigating factors. The judge's discussion of defendant's opportunities for rehabilitation in the juvenile justice system and the present importance of protecting the public given defendant's response to those efforts are readily understood as the judge's explanation for concluding that defendant's age is not a mitigating factor. See id. at 610 n. 11, 985 A.2d 1251. Moreover, the aggravating factors found by the judge are supported by the record. State v. Cassady, 198 N.J. 165, 180-81, 966 A.2d 473 (2009).
In contrast to the judge's explanation of his reasons for the duration of sentence, where he applied the statutory aggravating factors to the facts he found, the judge discussed facts relevant to consecutive sentences without mentioning the standards governing that discretionary determination. Those standards are set forth in State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986). The judge noted:
[Defendant] entered the private home in Irvington in possession of a sawed off shotgun and while armed committed a robbery against two separate individuals.
Indeed, during the course of the trial it came out that they attempted to rob a third individual, but he had nothing on *113 his person and, therefore, took nothing of his person. For reasons which are unknown to me he was never charged with attempted robbery, which would have been a third offense.
There was no express mention of the Yarbough criteria warranting consecutive sentences for the two robberies and concurrent sentences for the other convictions.
Nonetheless, the judge's factual findings implicitly address two factors identified in Yarbough that militate in favor of consecutive sentences for the robberies. Those factors are that "there can be no free crimes in a system for which the punishment shall fit the crime" and that "the crimes involved multiple victims." Id. at 643-44, 498 A.2d 1239.
We recognize that on this record, the court could also have found facts in support of Yarbough factors that militate in favor of concurrent sentences. One could conclude that these robberies: involved one threat rather than "separate ... threats of violence"; had "objectives" that were not "predominantly independent of each other"; and were not "committed at different times or separate places" but were related so "closely in time and place as to indicate a single period of aberrant behavior." Id. at 644, 498 A.2d 1239.
As we understand the collective guidance provided in Bieniek and Cassady, if this court can "discern" that the judge considered governing principles that support the sentence, then "there is no basis upon which to upend [the judge's] reasoning." Cassady, supra, 198 N.J. at 182, 966 A.2d 473; see Bieniek, supra, 200 N.J. at 608-10, 985 A.2d 1251. Thus, a remand to clarify that the judge has considered all relevant factors is improper if the reviewing court can infer that the judge did so.
In this case, consecutive sentences for defendant's two robberies would be permissible if the judge concluded that defendant's use of a sawed-off shotgun to threaten two victims to surrender cash was of greater significance than the fact that the crimes were committed at the same time and place and not "predominately independent." While the judge did not articulate the balance he struck, it can be inferred from what the judge said. On that basis, we follow our understanding of the direction provided by the Court in Bieniek and Cassady, and affirm.
It is important to stress, however, that deference to the trial judge should not lead reviewing courts to resort to speculation in an effort to identify facts and reasons not articulated or clearly implied by the trial court that permit affirmance of a sentence. This court must not only avoid substituting its judgment for that of the trial judge but also avoid usurping the "solemn and serious" responsibility that is vested in the trial judge. Cassady, supra, 198 N.J. at 180, 966 A.2d 473 (quoting State v. Roth, 95 N.J. 334, 365, 471 A.2d 370 (1984)).
Respect for the role and importance of the trial judge and for this court's obligation to review the exercise of sentencing discretion to ensure adherence to the legal principles governing its exercise  not some unstated disagreement with the sentence imposed  is what leads this court to remand when reasons are not stated or clearly implied by the trial judge at the time of sentencing. It is well-settled that judicial discretion is arbitrarily exercised when the guiding legal principles are not considered. State v. Madan, 366 N.J.Super. 98, 110, 840 A.2d 874 (App.Div.2004).
Because it is our obligation to review a sentence for adherence to legal principles, not to decide the matter in the first instance, this court must avoid guessing *114 about whether the trial court considered the legal standards that limit its discretion. There is a difference between remanding to avoid guessing about whether the judge would impose the same sentence if the legal principles implicated by the facts had been addressed and second-guessing the sentence imposed. Any effort by a reviewing court to supply findings and reasons, not expressly stated by the trial judge, carries a risk  the risk of crossing the line that separates review of the trial judge's decision from an unwarranted and unacknowledged exercise of original jurisdiction to make a sentencing decision entrusted to the trial judge. See R. 2:10-5.
In this case, the judge's factual findings supporting the imposition of consecutive sentences are sufficiently implicit in his statement of reasons to permit us to infer that this discretionary decision is a product of a conscientious application of the controlling legal principles to the relevant facts. Accordingly, we can defer. There is no deviation from the legal principles that is sufficiently apparent to provide a principled basis for concluding that this sentence is shocking to the judicial conscience.
Defendant's convictions and sentence are affirmed. A remand is required to permit the trial court to acknowledge in the judgment its decision to rectify the erroneous ruling on merger of defendant's conviction for possession of the firearm with an unlawful purpose that is reflected on the sentencing transcript. State v. Murray, 338 N.J.Super. 80, 91, 768 A.2d 221 (App.Div.), certif. denied, 169 N.J. 608, 782 A.2d 426 (2001). In addition, the judge is directed to correct the judgment so it reflects a conviction for second-degree burglary, rather than second-degree robbery, and so that it accurately states the duration of the NERA parole supervision term on count three.
Affirmed but remanded for correction of the judgment.
NOTES
[1] In pronouncing sentence, the judge did not merge defendant's conviction for possession of a firearm with an unlawful purpose, but the judgment reflects that merger. The merger is required by law where, as here, the jury instruction did not require the jurors to find a purpose independent of the robberies or burglary. See State v. Diaz, 144 N.J. 628, 677 A.2d 1120 (1996).